**LUKENS STEEL COMPANY, Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

**No. 18752.**

United States Court of Appeals, Third Circuit.

Argued March 1, 1971.

Decided May 3, 1971.

Karl Schmeidler, Tax Division, Dept. of Justice, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Crombie J. D. Garrett, Attys., Tax Division, Dept. of Justice, Washington, D. C., on the brief) for appellant.

Robert H. Kapp, Hogan & Hartson, Seymour S. Mintz, Joseph M. Hassett, Washington, D. C. (James F. Mulligan, Gen. Counsel, Lukens Steel Co., Coatesville, Pa., on the brief) for appellee.

Before HASTIE, Chief Judge, and McLAUGHLIN and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

GERALD McLAUGHLIN, Circuit Judge.

The Commissioner of Internal Revenue seeks a review of the Tax Court's decision 52 T.C. 764, allowing Lukens Steel Co., an accrual basis taxpayer, a business expense deduction for amounts which it credited to its contingent liability account for the years 1962 and 1963.

The majority of Lukens Steel Co. employees have been represented by the United Steelworkers of America. In 1956 a new contract was agreed upon between the Steelworkers Union and the steel industry. This contract was subsequently adopted by Lukens Steel Company. Among other things, the contract called for the establishment of a Supplemental Unemployment Benefit Plan (hereinafter called SUB Plan). The purpose of this plan was to ameliorate the effects of cyclical unemployment in the steel industry by supplementing state unemployment benefits available to laid off employees. To be eligible for these benefits an employee must have been laid off, before he quits, strikes, or is discharged, and have been continuously employed for two years prior to such a layoff. He must also receive state unemployment benefits and be able to work. The funds to finance this plan were to be contributed by Lukens to a trust fund which in turn would be the exclusive source of the benefits. These benefits were fixed as to maximum rates and length of time payable. The rates would be decreased when the fund went below a specified amount.

Lukens' financial obligation under the SUB Plan consisted of a current cash obligation and a contingent liability. With respect to the former, Lukens was obligated to pay monthly to the trust, in cash, three cents for each hour worked by its eligible employees during the month, subject to limitations designed to prevent the total finances of the Plan from exceeding prescribed maximum levels (herein called maximum financing).[1]

Lukens was also subject to a contingent liability of an additional two cents for each hour worked by eligible employees, until maximum financing was reached. Amounts credited to this contingent liability were payable to the SUB Plan Trust only if the trust assets were insufficient to permit payment of unemployment benefits. The contingent liability was cancellable at such times and

---

[1]. Maximum financing is defined in Art. III, Sec. 2(B) of the 1956 SUB Plan as the product of 10.5 cents multiplied by the number of contributory hours worked by covered employees during the first thirteen of the fifteen accounting periods immediately preceding the accounting period for which the determination of maximum financing is made. Generally speaking, contributory hours are all of the hours during which all of the employees covered by the 1956 SUB Plan actually performed services for Lukens.

To illustrate, if it is assumed that the 1956 SUB Plan covered only one Lukens employee who worked forty hours a week during fifty of the fifty-two or fifty-three possible weeks which might be included in thirteen consecutive fiscal accounting periods, maximum financing with respect to that employee would be 10.5 cents x 40 hours x 50 weeks, or $210.

to the extent that the total finances of the SUB Plan exceeded maximum.

Also, upon termination of the SUB Plan Agreement on July 31, 1959 any remaining contingent liability not needed for the pay out of unemployment benefits was cancellable in full. All assets in the trust resulting from cash contribution were to be used until exhaustion and could in no event be returned to Lukens. The SUB Plan Agreement expired on July 31, 1959; however, as a result of collective bargaining it was extended to December 31, 1962.

In its federal income tax returns for fiscal years from 1956 through 1961, Lukens claimed and was allowed deductions for cash contributions paid or payable to the SUB Plan Trust. Lukens did not claim deductions in its tax return for the unpaid contingent liability.

As a result of hard bargaining between representatives of the steel industry and the United Steelworkers of America certain changes were made in the SUB Plan in 1962. The 1962 SUB Plan broadened and increased the benefits to the employees and altered the method of financing the Plan. The balance of the contingent liability under the previous plan was carried forward as a 1962 SUB Plan Trust asset and treated as contingent liability under the 1962 SUB Plan. The terminology of the original SUB Plan was carried over to the revised plan with reference to the unfunded portion of the steel company's obligation and referred to as "contingent liability" even though it was no longer truly contingent.

Some of the changes made in the 1962 SUB Plan were: benefits would be extended to include a relocation allowance; certain disability benefits were included; and maximum financing was increased. Also, every month, the company incurred the obligation to contribute 9.5 cents to the Fund for each hour worked by eligible employees. The obligation was divided so that 4.5 cents per hour was given to the Trust Fund, and 5

cents per hour to be credited to the contingent liability account.

This obligation, once incurred, could not be extinguished, reduced or cancelled or in any other manner revert to the benefit of the steel company. It was expressly provided that upon termination of the SUB Plan, the contingent liability shall be subject to all the applicable provisions of the Plan then in effect and shall be used until exhausted to pay benefits to the employees. Moreover, if the operation of the steel company should be permanently shut down, disposition of the assets in the SUB Plan Trust Fund and the contingent liability account were to be made in a manner designed to promote the purposes of the SUB Plan Agreement.

As in the original SUB Plan the revised agreement placed a ceiling on the obligation of the steel company. It provided that the monthly obligation, both the current cash element and contingent liability would not be incurred if total finances of the SUB Plan exceeded maximum financing. Where maximum financing was exceeded the companies were permitted to effect an absolute saving to the extent of 5 cents per hour. It was provided that 4.5 cents per hour instead of accruing to the SUB Plan would be paid to the steel industry's Saving and Vacation Plan to the extent needed to pay benefits thereunder; if not needed there, it would revert to the SUB Plan.

The 1962 SUB Plan financing provisions were carefully worked out upon the basis of a comprehensive statistical analysis of relevant cost factors and unemployment experience. In the light of the analysis the negotiators concluded that a contribution rate of 9.5 cents per hour would be required to provide the benefits. It was assumed that after a few years the plan probably would be financed with payments to the trust from the contingent liability account.

Lukens claimed as deductions on its 1962 and 1963 tax returns the total aggregate monthly obligation (both the

current cash element and contingent liability) which it incurred in those years as payments to the SUB Plan. In addition, Lukens claimed as a deduction in its fiscal 1962 return the balance of the contingent liability under the old SUB Plan which was carried over to the revised 1962 SUB Plan.

The Commissioner limited Lukens' deduction for fiscal 1962 and 1963 to the amount which Lukens paid to the SUB Plan Trust in cash and disallowed all else. The Tax Court held the entire deferred obligation incurred during 1962 and 1963, including the balance carried over from the 1956 SUB Plan, constituted a proper accrual and was then deductible as ordinary and necessary business expenses. The Commissioner appeals that decision.

■ The legal principles which govern the time of accrual of Lukens' obligation under the SUB Plan are not a matter of controversy. The rule is basically that before an expense becomes deductible, all events which fix the amount of liability of the taxpayer must have occurred. See United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L. Ed. 347 (1926). The Supreme Court has also held that a taxpayer who accounts on the accrual basis may and should deduct from gross income a liability which really accrues in the taxable year. See Dixie Pine Products Co. v. Commissioner of Internal Revenue, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270 (1944).

There is no issue on appeal concerning the governing law. The controversy involves only the application of that law to the facts of this case, i. e., have sufficient events occurred during the years in question to fix the obligation to pay this liability in the form of cash. We think there have and so affirm the Tax Court's decision.

Subject to the terms of the SUB Plan, when an eligible employee performed the required duties, Lukens was required to put 9.5 cents aside for each hour worked by the employee. Once earned, the money was committed to inure to the benefit of the eligible members of the Steelworkers Union. It is true that 5 cents per hour of this amount was credited to the contingent liability account and would not be paid out immediately or at a specified time. However, at some future date this money would be paid. It was not possible for Lukens to cancel the contingent liability account without paying it to the Union. In similar situations it has been held that indeterminancy as to the time or amount of payment does not destroy the deductibility of an accrued item when the amount of liability is absolutely fixed. See Kershaw Manufacturing Co. v. Commissioner of Internal Revenue, 313 F.2d 942 (5 Cir. 1963); Willoughby Camera Stores v. Commissioner of Internal Revenue, 125 F.2d 607 (2 Cir. 1942); Rath Packing Co. v. Bacon, 255 F.Supp. 809 (S.D. Iowa 1966).

The cost of funding the plan was not arbitrarily determined, a group of experts on economics and statistics was selected by the steel companies and the Union to deal with the problem. In the light of their analysis, the negotiators concluded that a contribution rate of 9.5 cents per hour would be required to provide the agree upon SUB Plan benefits. The amount actually disbursed to the Trust Fund in cash and immediately available for distribution was less than one half of the amount the experts felt was needed, the balance was to be in contingent liability account. As a result of this arrangement it was anticipated that the Plan would be funded exclusively with contingent liability within a few years after it was in effect, in fact, the assets of the SUB Plan Trust were entirely exhausted and the Plan was funded with contingent liability before the end of 1963.

The SUB Plan was designed so that even if the experts were wrong, and the contingent liability was not needed, the remaining assets including contingent liability were to be used to pay benefits

to Lukens' eligible employees, either at the termination of the Plan or of the Company. The amount credited to the contingent liability would always be potentially available to Lukens' eligible employees. In no event could the contingent liability be cancelled by Lukens, actually it was the latter's fixed and absolute liability and the only uncertainty pertaining to it was the time of payment. "When a group liability is involved, it is the certainty of the liability which is of utmost importance in the 'all events' test, and not necessarily either the certainty of the time over which payment will be made or the identity of the payees." See Washington Post Co. v. United States, 405 F.2d 1279, 1284, 186 Ct.Cl. 528 (1969). Similarly, other decisions have allowed a deduction where the liability was fixed in amount even though the time of payment was uncertain. See Clark v. Woodward Construction Co., 179 F.2d 176 (10 Cir. 1950); Keebey's Inc. v. Paschal, 188 F.2d 113 (8 Cir. 1951).

The facts in the Washington Post action are quite like the situation before us. A newspaper publisher in order to provide incentives to its dealers, both to increase sales volume and maintain a continuing relationship with the publisher, promised to accrue on its books for the benefit of eligible dealers an amount which was supposed to reflect the dealers' contribution to the Post's success for the previous year. The Post reserved the right to discontinue or alter this arrangement at any time but it irrevocably obligated itself to distribute all amounts accrued as of the time of discontinuance. The portion of the Post's annual contribution allocated to each dealer was payable in full when the dealer's contract was terminated by reason of his having become a Post employee or when, while under contract, he died, became disabled or reached age 55. In the event a dealer's contract was terminated for any reason he would receive up to 70 percent of the sum allocated to his account, the balance of that money would be distributed amongst the re-

maining dealers, to be paid when they qualified. In holding that liability deductible the court said: " * * * the 'all events' test that comes down to us from United States v. Anderson is not inflexible; when the liability itself is clearly fixed, as in this case, other uncertainties do not necessarily destroy that initial certainty." Washington Post Co. v. United States, supra at 1284.

In the instant litigation, the amount of liability is fixed by the number of hours worked by the eligible employees. At the end of the company's fiscal year, the amount of liability is determined by events which happened during the year. It was anticipated that the amount accrued would be paid in a reasonable period of time. While the ultimate recipient is now known and the amount he is to receive is uncertain, the United Steelworkers of America is the group from which all recipients must come, and the total amount payable at any given time is determinable. However, of necessity the exact time of payment is unknown. Under all the facts we are satisfied that uncertainty of the time of payment is not of such importance to SUB Plan as to call for reversal of the Tax Court's sound conclusions. The decision of the Tax Court will be affirmed.

HASTIE, Chief Judge (concurring).

The Tax Court found that it was probable and was reasonably anticipated by the parties that the sums the taxpayer irretrievably committed to the Supplemental Unemployment Benefit Fund during the taxable years would have to be paid out within a relatively short time that could be estimated approximately. That finding makes it unnecessary to decide whether sums committed to such a fund as this are then immediately deductible as an accrued business expense if the time of future disbursement is entirely speculative and is as likely to occur decades hence as in the near future. Yet the opinion of the Court seems broad enough to cover that situation. I

prefer not to express any opinion whether an immediate deduction would have been allowable in such a case.

With this reservation, I concur in the affirmance of the Tax Court's decision.