REYNOLDS METALS COMPANY COMMON PARENT CORPORATION OF REYNOLDS METALS COMPANY AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9705–75. Filed September 26, 1977.

*Walter C. Cliff, Marvin S. Goldklang, and Lawrence H. Cohen,* for the petitioner.

*Ronald P. Campbell,* for the respondent.

## OPINION

STERRETT, *Judge:* Respondent determined deficiencies in petitioner's corporate Federal income taxes for the calendar years 1962 and 1963 in the amounts of $1,213,379.04 and $34,800.89, respectively. The sole issue for decision is whether petitioner, an accrual basis taxpayer, may deduct, pursuant to section 162, I.R.C. 1954, the unpaid portion of its obligation at the end of 1962 and 1963 to make contributions to employees' trusts established under a union-management negotiated supplemental unemployment benefit plan.

This case was submitted under Rule 122, Tax Court Rules of Practice and Procedure, hence all of the facts have been stipulated and are so found.

Petitioner Reynolds Metals Co., common parent corporation of Reynolds Metals Co. and subsidiaries (including Reynolds Mining Corp.), is a corporation organized and existing under the laws of the State of Delaware with its principal office at Richmond, Va. Petitioner (hereinafter sometimes referred to as Reynolds) is engaged in all phases of the aluminum industry from the mining of bauxite to the manufacture, fabrication, and sale of aluminum and aluminum products. It

is the second largest producer of primary aluminum in the United States and the third largest in the world. Petitioner is a publicly held corporation whose shares are traded on the New York Stock Exchange.

Reynolds maintains its books of account and files consolidated Federal income tax returns on a calendar year basis, utilizing the accrual method of accounting. For the years 1962 and 1963 petitioner timely filed its consolidated Federal income tax returns with the District Director of Internal Revenue, Richmond, Va.

In 1956 labor contracts that previously had been entered into by the United Steelworkers of America (hereinafter steelworkers)[1] with companies in the basic steel and aluminum industries and by the Aluminum Workers International Union (hereinafter aluminum workers)[2] with companies in the aluminum industry were scheduled to expire. During the early months of that year, the steelworkers and companies involved in the basic steel industry were engaged in collective bargaining with a view toward developing a comprehensive labor contract to take effect as of July 1, 1956. As a result of the predominance of the basic steel over the aluminum industry in terms of relative size, as well as the fact that a majority of members of the steelworkers were employed in the basic steel industry, negotiations involving the steelworkers initially were conducted with companies in the steel industry. Negotiations between the aluminum workers and companies in the aluminum industry proceeded at a comparatively slow pace, pending the outcome of an agreement between the steelworkers and the steel industry.

Labor contract negotiations during 1956 in the steel industry essentially were conducted on two levels. First, a group representing a number of the largest steel companies bargained jointly with the steelworkers on major economic issues with the understanding that any settlement reached

[1] The United Steelworkers of America is an international labor organization whose members are employed in the basic steel-related industries, including steel processing and fabricating, iron mining and ore shipping, and the aluminum and copper industries. It has over 1 million individual members who are organized into approximately 3,000 local unions.

[2] The Aluminum Workers International Union is an international labor organization whose members are employed in the aluminum industry. It has over 30,000 members who are organized into approximately 90 local unions.

would be uniformly applied to the participating companies. At the same time each company bargained separately with the steelworkers on local issues, or issues affecting only that company. In the aluminum industry, although each company bargained separately with the steelworkers, the outcome of the negotiations on major economic issues was dependent largely upon resolution of negotiations with the steel companies.

As a result of the cyclical nature of the steel industry, the steelworkers' 1956 contract demands to the steel companies included a proposal for a supplemental unemployment benefit program designed to supplement, by means of cash payments, the benefits available under State unemployment benefit programs to union-represented employees who suffered layoffs. This proposal was one of the major economic issues on which the major steel companies bargained jointly with the steelworkers. As a result of the joint negotiations, each of the major steel companies agreed to establish a supplemental unemployment benefit plan (hereinafter SUB plan). The terms of the SUB plan adopted by each of the major producers of steel participating in the joint negotiations were virtually identical. After agreement on the terms of the SUB plan had been reached in the joint negotiations, the remaining companies in the basic steel industry whose employees were represented by the steelworkers also adopted SUB plans on substantially identical terms. Thus, separate, virtually identical, SUB plans were placed in operation in practically all companies in the steel industry. The objective of the SUB plans, as envisioned in 1956, was to provide covered employees (with 2 or more years of service) with 65 percent of their after tax take-home pay, taking into account State benefits, for periods of up to 52 weeks.

After contract negotiations with the steel companies were completed, the steelworkers focused its negotiating efforts on the major aluminum companies, including petitioner, whose labor contracts were scheduled to expire on August 1, 1956. As was the case with the steel industry, in light of the cyclical nature of the aluminum industry, a basic element of the steelworkers' demands involved establishment of SUB plans in the aluminum industry.[3] After collective bargaining

---

[3] We note that, based upon monthly percentage differences in production,

petitioner and the steelworkers entered into a comprehensive labor contract, dated as of July 31, 1956, covering all of the petitioner's employees represented by the steelworkers, which included a provision for establishment of a SUB plan (hereinafter referred to as the 1956 SUB plan).[4] The 1956 SUB plan adopted by petitioner is the same in all material respects as the SUB plans adopted in the steel industry in 1956 pursuant to the basic agreement between the steelworkers and the steel companies and considered by this Court in *Lukens Steel Co. v. Commissioner*, 52 T.C. 764 (1969). In this regard, reference should be made to our findings of fact therein.

Also, in addition to the negotiations with the steelworkers in 1956, petitioner negotiated a comprehensive labor contract with the aluminum workers. One of the demands of the aluminum workers was a SUB plan and, after collective bargaining, petitioner and the aluminum workers entered into a comprehensive labor contract, dated as of August 6, 1956, which required establishment by petitioner of a SUB plan.[5] The SUB plan agreed to with the aluminum workers was the same in all material respects as the 1956 SUB plan agreed to with the steelworkers (both plans hereinafter referred to collectively as the 1956 SUB plan). The 1956 SUB plan also was included without change in labor contracts between petitioner and other unions representing employees at its plants.

To implement the 1956 SUB plan with the steelworkers and the aluminum workers, and in accordance with its provisions, petitioner, on June 21 and July 8, 1957, established, with the Chase Manhattan Bank of New York as trustee, two trusts respectively denominated as the "Reynolds Metals Company Supplemental Unemployment Benefit Plan Trust I and II." Trusts I and II were each determined by the Internal Revenue

---

petitioner's monthly aluminum production fluctuated approximately in the same manner as production of the United States steel industry.

[4] Since petitioner had numerous labor contracts, the 1956 SUB plan was set forth as a separate document and incorporated by reference in the labor contract. Also the 1956 SUB plan agreed to with the steelworkers was extended to cover the employees of Reynolds Mining Corp., a wholly owned subsidiary of petitioner.

[5] Petitioner negotiated a separate contract for each plant where employees were represented by the aluminum workers; however, these contracts essentially were the same except for local issues.

Service to be an organization described in section 501(c) and therefore exempt from Federal income taxes.

Under the 1956 SUB plan, petitioner agreed to contribute funds required to provide its eligible employees with cash benefits during periods of total unemployment resulting from layoffs in connection with a reduction in work force or from the permanent shutdown of a plant, department, or subdivision thereof, and during weeks in which, because of lack of work, an employee was scheduled or assigned to work less than 32 hours. Reynolds' obligation under the 1956 SUB plan to make contributions to Trusts I and II[6] was determined by means of a formula based on the number of hours worked by covered employees in the preceding month, with limitations to prevent the finances of the trusts from exceeding defined maximum levels. Petitioner's obligation was comprised of two elements: a current cash contribution and a contingent liability, determined in the following manner:

a. Petitioner was required to contribute currently in cash to Trust I, 3 cents per hour, and to Trust II, 1 cent per hour, multiplied by the number of hours worked during the month (contributory hours) or, if less, the amount necessary to bring the finances of the 1956 SUB plan to the defined maximum level.

b. The contingent liability was the lesser of (i) the product of 2 cents per hour for Trust I and 4 cents per hour for Trust II, multiplied by the number of hours worked in the month (contributory hours) or (ii) the amount necessary to bring the finances of the 1956 SUB plan to the defined maximum level. If, for any month, the finances of the 1956 SUB plan exceeded the maximum level, the contingent liability was to be decreased by the amount of such excess.

Petitioner was required to make cash contributions to Trusts I and II in respect to the contingent liability when necessary to fund the benefits provided for by the 1956 SUB plan, or in other words contributions were required, with respect to the contingent liability, only when the assets of Trusts I and II were insufficient to provide the benefits to the plan.[7] Although the balance of the unfunded contingent liability was

---

[6] Trust I and Trust II were the sole source of payment of benefits under the 1956 SUB plan.

[7] If for any month the finances of the SUB plan equaled the maximum level, the contingent liability was not increased; if for any month the finances of the plan exceeded the maximum level, the contingent liability was decreased by the amount of such excess.

to be canceled at the expiration of the agreement, upon termination of the plan, the funds then remaining in the trusts were to be used until exhausted to pay unemployment benefits to eligible employees. In no event could any funds held by the trust revert to petitioner.

The 1956 SUB plan was scheduled to expire on July 31, 1959. As a result of collective bargaining negotiations conducted with the steelworkers and the aluminum workers, the 1956 SUB plan was extended without change in terms to July 31, 1962, and the balance of the contingent liability as of July 31, 1959, was carried over as a contingent liability under the extended agreement. During the period commencing with the establishment of the 1956 SUB plan and ending July 31, 1962, petitioner made cash contributions pursuant to its noncontingent obligations to the Trusts I and II in the following amounts:

|  | Trust I | Trust II | Total |
|---|---|---|---|
| 1956 | $189,541.07 | $70,088.92 | $259,629.99 |
| 1957 | 534,149.75 | 182,471.34 | 716,621.09 |
| 1958 | 479,296.61 | 159,269.29 | 638,565.90 |
| 1959 | 492,317.49 | 169,471.93 | 661,789.42 |
| 1960 | 404,688.27 | 162,515.95 | 567,204.22 |
| 1961 | 378,994.86 | 172,789.52 | 551,784.38 |
| Jan. 1–July 31, 1962 | 232,138.62 | 106,252.49 | 338,391.11 |

For the period commencing with the establishment of the 1956 SUB plan and ending July 31, 1962, petitioner made additional cash contributions in respect of the contingent liability to Trusts I and II in the following amounts:

|  | Trust I | Trust II | Total |
|---|---|---|---|
| 1956 | 0 | 0 | 0 |
| 1957 | 0 | 0 | 0 |
| 1958 | 0 | $555,000.00 | $555,000.00 |
| 1959 | $30,000.00 | 330,000.00 | 360,000.00 |
| 1960 | 414,776.70 | 515,022.70 | 929,799.40 |
| 1961 | 358,309.24 | 377,259.51 | 735,568.75 |
| Jan. 1–July 31, 1962 | 0 | 7,488.96 | 7,488.96 |

The amount of petitioner's accumulated unpaid contingent liability under the 1956 SUB plan through and including the 6-month period ended July 31, 1962, was as follows:

|  | Trust I | Trust II | Total |
|---|---|---|---|
| 1956 | $126,360.70 | $280,355.66 | $406,716.36 |
| 1957 | 482,460.54 | 1,010,241.06 | 1,492,701.60 |
| 1958 | 801,992.00 | 1,092,318.20 | 1,894,310.20 |
| 1959 | 1,100,204.00 | 1,440,205.92 | 2,540,409.92 |
| 1960 | 955,218.76 | 1,575,247.02 | 2,530,465.78 |
| 1961 | 849,572.76 | 1,608,014.97 | 2,457,587.73 |
| July 31, 1962 | 1,004,331.84 | 1,712,998.65 | 2,717,330.49 |

On its Federal income tax return for the years 1956 through 1961, petitioner claimed, and was allowed, deductions for payments made to Trusts I and II, both with respect to its contingent liability to the extent that such liability matured and payment was made and to its current cash payment obligation.[8] For these years petitioner did not claim deductions in respect of its unpaid contingent liability under the 1956 SUB plan.

From the commencement date of the 1956 SUB plan and as of July 31, 1962, cash benefits were paid to petitioner's employees in the following amounts:

|  | Trust I | Trust II | Total |
|---|---|---|---|
| 1956 | 0 | 0 | 0 |
| 1957 | $40,576.20 | $17,977.05 | $58,553.25 |
| 1958 | 915,751.27 | 888,564.02 | 1,804,315.29 |
| 1959 | 568,833.73 | 530,918.94 | 1,099,752.67 |
| 1960 | 996,414.75 | 674,109.62 | 1,670,524.37 |
| 1961 | 735,035.85 | 554,054.99 | 1,289,090.84 |
| Jan. 1-July 31, 1962 | 125,293.73 | 113,697.48 | 238,991.21 |

In early 1962 the steelworkers commenced negotiations with the basic steel industry with respect to a new contract to replace the agreement scheduled to expire during that year.[9]

---

[8] The annual deductions claimed and allowed were as follows:

| 1956 | $259,629.99 | 1959 | 1,021,789.42 |
|---|---|---|---|
| 1957 | 716,621.09 | 1960 | 1,497,003.62 |
| 1958 | 1,193,565.90 | 1961 | 1,287,353.13 |

[9] The negotiations were conducted in essentially the same manner as they were in 1956.

The steelworkers contended that the SUB plans established under the 1956 agreement had proven inadequate to fulfill its objectives and demanded improvements. It insisted upon an increase in the 5-cents-per-hour maximum contribution rate and abolition of the provision for elimination of the contingent liability when a given maximum level was reached. The steelworkers' negotiators contended that the 5-cents-per-hour contribution rate had been inadequate to supply the funds required to permit payment of the full benefits contemplated in the 1956 negotiations and that the provision for cancellation of the contingent liability operated to deprive the SUB plans of resources which were needed to pay benefits during periods of unemployment. In addition, negotiators for the steelworkers contended that the heavy unemployment and layoffs experienced in the industries organized by steelworkers during the period from 1956 to 1961 had caused a drain on SUB plan resources and, as a consequence, there had been reductions in benefits paid under the SUB plans.

The matter of the proposed noncancelable character of the contingent liability of the steel companies under a new SUB plan was discussed at considerable length during the 1962 negotiations. At the outset of the negotiations the steelworkers' representatives demanded that the contributions of the steel companies to the SUB plan should be entirely in cash since they claimed that by permitting some part of the contribution to be in the form of a noncash deferred obligation, the steelworkers was forced to take the risk of the continued financial health of the steel companies. The position of the steel companies was that the steelworkers' criticisms of the 1956 SUB plan's contingent liability provisions could be eliminated entirely by providing that the deferred obligation under the new SUB plan be noncancelable, and, in view of the financial position of the steel companies, the demand for all-cash payments was invalid. The steelworkers agreed to drop its demands for all-cash arrangements on the condition that the contingent liability be made noncancelable. This condition was agreed to by the industry negotiators and was later implemented in drafting the 1962 SUB plan.

During the early part of the 1962 negotiations, it was agreed in principle that the financial resources of the new

SUB plans (as expressed in terms of the hourly rate of contribution) should be set at a level which would permit as nearly as possible payment of the intended benefits. After the foregoing understanding had been reached, the negotiators turned the problem over to a group of experts on economics and statistics selected by the steel companies and the steelworkers. These experts estimated that the cost per hour of providing full benefits under the original 1956 benefit formula was 6.7 cents and the added cost per hour of all of the new full benefits agreed upon by the negotiators in 1962 would be 3.3 cents. The reduction in hourly cost which would accompany certain agreed benefit reductions was calculated to be 0.5 cents. In calculating the level of contribution which would be required to provide the SUB plan benefits and the amount of benefits which would be paid, the experts took into account the balance of the contingent liability under the 1956 SUB plans which the negotiators agreed was to be carried forward to the revised SUB plans in the form of a delayed payment obligation. Based upon these calculations, the negotiators concluded that a contribution rate of 9.5 cents per hour would be required to fund the benefits provided in the SUB plan.[10]

After agreement on the terms of the revised SUB plans had been reached in 1962 with the major steel producers and the remaining companies in the basic steel industry, represented by the steelworkers, the steelworkers attempted to reach an agreement with the major aluminum companies. They demanded the same changes which were agreed to in the basic steel industry contract, and petitioner agreed to these changes in a comprehensive labor contract, dated as of June 28, 1962, and in a revised SUB plan (hereinafter referred to as the 1962 SUB plan).

Petitioner also negotiated and concluded a comprehensive labor contract with the aluminum workers, dated as of August 2, 1962, providing for a revised SUB plan which was the same

---

[10] Pursuant to a series of proposals and counterproposals, the steelworkers' and the steel industry negotiators agreed to a number of revisions in the contribution, benefit, and financing provisions of the SUB plan which were designed, in large measure, to correct the defects of which the negotiators for the steelworkers had complained, primarily with respect to the cancelable feature of the earlier contingent liability account.

in all material respects as petitioner's revised SUB plan with the steelworkers and the SUB plans established in 1962 between the steelworkers and the steel industry.[11] Again, the 1962 SUB plan was the same in all material respects as the SUB plan considered by this Court in *Lukens Steel Co. v. Commissioner, supra,* and reference should be made to our earlier findings of fact therein.

Furthermore, the 1956 SUB plan agreed to with the steelworkers had been extended to cover members of several craft unions representing workers at two of petitioner's plants at which the steelworkers represented production employees. One of these plants was the McCook Sheet & Plate Mill at Brookfield, Ill. In 1962 all of the craft unions at the McCook plant, with the exception of the brickmasons, insisted that contributions to fund their SUB benefits be made pursuant to a separate plan and to a separate trust. The reason given was that they had received no benefits from contributions made on their behalf by petitioner but that these benefits were being expended for employees represented by the steelworkers who were on layoff at other plants. After the matter was negotiated an agreement was reached to create a separate trust fund for the McCook plant craft unions, including machinists, electricians, pipefitters, carpenters, and blacksmiths.

To implement the McCook SUB plan, and in accordance with its provisions petitioner, on December 26, 1962, established, with the Chase Manhattan Bank of New York as trustee, a trust denominated as the Reynolds Metals Co. Supplemental Unemployment Benefit Plan Trust III (hereinafter Trust III). Trust III was determined by the Internal Revenue Service to be an organization described in section 501(c). Hereinafter the McCook SUB plan and the 1962 SUB plans with the steelworkers and aluminum workers will sometimes be referred to, collectively, as the 1962 SUB plan.

As was the case under the 1956 SUB plan, under the terms of the 1962 SUB plan, all cash payments were made to Trusts I, II, and III, and all benefits to eligible employees thereto were to be paid only from those trusts. However, petitioner's

---

[11] As was the case of the 1956 plan, the 1962 SUB plan also covered the employees of Reynolds Mining Corp.

financial obligation was revised under the 1962 SUB plan and consisted of two portions: a current cash payment and a deferred payment obligation. These two portions were collectively referred to as the monthly obligation. The delayed payment obligation was referred to in the 1962 SUB plan as the contingent liability, a term which was carried over from the 1956 SUB plan as a matter of convenience.

Under the 1962 SUB plan petitioner's monthly obligation was the lesser of (a) 9.5 cents times the number of hours worked during each calendar month by all covered employees or (b) an amount which, when added to the total finances of the particular SUB plan as of the end of the preceding calendar month, would bring the total finances to defined maximum levels. With respect to a monthly obligation, petitioner was required to contribute currently in cash to Trusts I, II, and III the excess, if any, of (a) 10.5 cents multiplied by the number of hours worked by all covered employees for the first 12 of the 14 months preceding the contribution month over (b) the total finances of the particular SUB plan at the end of the preceding month, but not to exceed 4.5 cents (2 cents under Trust II) per hour worked by all covered employees during the month. The delayed payment obligation was the balance of the monthly obligation less the current cash payment.

Petitioner's only obligation to make payments to Trusts I, II, and III was as follows: (1) The cash contributions required as the result of calculations relating to the contribution month described above; (2) the cash contributions up to the balance of the contingent liability accrued at any time; however, such contributions shall not be made unless needed for payment of benefits and when made shall cancel an equal amount of contingent liability. The payment into the particular trust of any part of the delayed payment obligation would cancel an equal amount of accumulated delayed payment obligation. Additionally, the 1962 SUB plan provided that upon its termination or upon cessation of the operations of petitioner, the assets remaining in Trusts I, II, and III and the balance of the accumulated delayed payment obligation would

be used to pay the benefits described in the 1962 SUB plan until the amounts were exhausted.[12]

The 1962 SUB plan provided that the balance of the contingent liability under the 1956 SUB plan, $2,717,330.49, was to be carried over to the 1962 SUB plan as an additional delayed payment obligation. The amounts carried over were payable to Trusts I and II on the same terms and conditions as the delayed payment obligation incurred under the 1962 SUB plan, and the provisions of the 1956 SUB plan relating to cancellation or reduction of this amount were eliminated. Petitioner had unrestricted use of moneys represented by the delayed payment obligation until paid to Trusts I, II, and III.

During the period August 1, 1962, through December 31, 1963, petitioner made cash contributions pursuant to its current cash payment obligation to Trusts I, II, and III in the following amounts:

| | Trust I | Trust II | Trust III | Total |
|---|---|---|---|---|
| Aug. 1–Dec. 31, | | | | |
| 1962 | $213,013.45 | $70,788.75 | $17,591.27 | $301,393.47 |
| 1963 | 297,171.69 | 0 | 32,137.29 | 329,308.98 |

The amounts of petitioner's accumulated unpaid delayed-payment obligation under the 1962 SUB plan, excluding the amounts carried over from the 1956 SUB plan, on the last day of each of its fiscal years 1962 and 1963 were as follows:

| | Trust I | Trust II | Trust III | Total |
|---|---|---|---|---|
| Aug. 1—Dec. 31, | | | | |
| 1962 | $236,681.50 | $556,416.07 | $19,545.80 | $812,643.37 |
| 1963 | 447,906.06 | 441,238.52 | 70,619.44 | 959,764.02 |

During the period August 1, 1962, through December 31, 1975, petitioner made cash payments with respect to its delayed payment obligation under the 1962 SUB plan, including the amounts carried over from the 1956 SUB plan, to Trusts I, II, and III in the following amounts:

---

[12] Petitioner did not terminate the 1962 SUB plan or permanently shut down operations during the years 1962 and 1963.

| | Trust I | Trust II | Trust III | Total |
|---|---|---|---|---|
| Aug. 1—Dec. 31, 1962 | 0 | 0 | 0 | 0 |
| 1963 | $551,273.90 | $391,000.00 | 0 | $942,273.90 |
| 1964 | 245,000.00 | 382,000.00 | 0 | 627,000.00 |
| 1965 | 75,000.00 | 215,000.00 | 0 | 290,000.00 |
| 1966 | 35,000.00 | 135,000.00 | 0 | 170,000.00 |
| 1967 | 20,000.00 | 205,000.00 | 0 | 225,000.00 |
| 1968 | 40,000.00 | 120,000.00 | 0 | 160,000.00 |
| 1969 | 30,000.00 | 50,000.00 | 0 | 80,000.00 |
| 1970 | 320,000.00 | 340,000.00 | 0 | 660,000.00 |
| 1971 | 750,000.00 | 1,395,000.00 | 0 | 2,145,000.00 |
| 1972 | 1,687,000.00 | 820,000.00 | 0 | 2,507,000.00 |
| 1973 | 140,489.14 | 270,347.98 | 0 | 410,837.12 |
| 1974 | 0 | 104,251.33 | 0 | 104,251.33 |
| 1975 | 2,452,500.00 | 2,253,013.02 | $104,000 | 4,809,513.02 |
| Total | 6,346,263.04 | 6,680,612.33 | 104,000 | 13,130,875.37 |

The following table shows the year a contingent liability under the 1956 SUB plan arose and the year by which it was paid in full to the trustee, using the "first-in, first-out" basis:

| Year contingent liability arose | Year by which payment in full was made to trustee | Year contingent liability arose | Year by which payment in full was made to trustee |
|---|---|---|---|
| 1956 | 1958 | 1960 | 1965 |
| 1957 | 1960 | 1961 | 1969 |
| 1958 | 1961 | Jan. 1— | |
| 1959 | 1963 | July 31, 1962 | 1970 |

The following table shows the year a delayed payment obligation under the 1962 SUB plan arose and the year by which it was paid in full to the trustee, using the "first-in, first-out" basis:

| Year delayed-payment obligation arose | Year by which payment in full was made to trustee | Year delayed-payment obligation arose | Year by which payment in full was made to trustee |
|---|---|---|---|
| Aug. 1—Dec. 31, 1962 | 1971 | 1969 | 1972 |
| 1963 | 1971 | 1970 | 1972 |
| 1964 | 1972 | 1971 | 1975 |
| 1965 | 1972 | 1972 | 1975 |
| 1966 | 1972 | 1973 | 1975 |
| 1967 | 1972 | 1974 | not yet |
| 1968 | 1972 | 1975 | not yet |

During the period August 1, 1962, through December 31, 1975, cash benefits paid to petitioner's employees under the 1962 SUB plan were as follows:

| Aug. 1—Dec. 31, | Trust I | Trust II | Trust III | Total |
|---|---|---|---|---|
| 1962 | $267,038.75 | $67,836.89 | 0 | $334,875.64 |
| 1963 | 924,980.49 | 396,647.52 | 0 | 1,321,628.01 |
| 1964 | 241,809.45 | 378,896.47 | 0 | 620,705.92 |
| 1965 | 80,315.04 | 218,024.48 | 0 | 298,339.52 |
| 1966 | 33,969.47 | 139,152.96 | 0 | 173,122.43 |
| 1967 | 17,532.96 | 197,815.89 | 0 | 215,348.85 |
| 1968 | 40,155.93 | 126,240.48 | 0 | 166,396.41 |
| 1969 | 29,761.36 | 47,098.16 | 0 | 76,859.52 |
| 1970 | 294,998.53 | 327,246.90 | 0 | 622,245.43 |
| 1971 | 683,579.90 | 1,366,789.43 | $7,392.68 | 2,057,762.01 |
| 1972 | 1,769,126.06 | 855,242.60 | 7,452.55 | 2,631,821.21 |
| 1973 | 202,722.82 | 279,314.50 | 21.43 | 482,058.75 |
| 1974 | 9,863.81 | 89,394.57 | 0 | 99,258.38 |
| 1975 | 2,807,483.95 | 2,187,196.24 | 161,971.52 | 5,156,651.71 |
| Total | 7,403,338.52 | 6,676,897.09 | 176,838.18 | 14,257,073.79 |

The delayed payment obligation arising under the 1962 SUB plan as well as the balance of petitioner's contingent liability under the 1956 SUB plan, which was carried over to the 1962 SUB plan, was not treated as an accrued expense and/or liability on petitioner's books of account and published financial statements during the taxable years 1962 and 1963.

Petitioner claimed as deductions on its 1962 and 1963 consolidated Federal income tax returns the respective amounts of $3,529,973.86 and $105,685.87 with respect to the delayed payment obligation, including the unpaid contingent liability amounts carried over from the 1956 SUB plan.[13] Respondent in his notice of deficiency, dated August 7, 1975, disallowed these deductions explaining that the payment of these amounts is contingent upon subsequent events and therefore the liability at the end of the taxable years is not deemed fixed and determinable.[14]

The parties agreed that the general rule to be used in determining the deductibility of the SUB benefits for the

---

[13] Pursuant to a private ruling from the Internal Revenue Service to petitioner, petitioner did not claim deductions on its consolidated Federal income tax returns for the taxable years 1964 through 1975 in respect of its unpaid delayed payment obligation arising in those years under the 1962 SUB plan.

[14] The amounts of delayed-payment obligation for which deductions were claimed in 1962 and 1963 in respect of the 1962 SUB plan are not in dispute.

years in issue, 1962 and 1963, is the "all events" test promulgated by the Supreme Court in *United States v. Anderson*, 269 U.S. 422 (1926). See also sec. 1.461–1(a)(2), Income Tax Regs.[15] Thus this controversy comes down to the application of this particular principle to the facts of the instant case. Moreover, the parties on brief agree that petitioner's 1956 and 1962 SUB plans, as implemented by Trusts I and II, with the steelworkers and aluminum workers and the factual background involved herein[16] are virtually identical in all material respects to the SUB plan provisions and the factual background considered by this Court in *Lukens Steel Co. v. Commissioner*, 52 T.C. 764 (1969), affd. 442 F.2d 1131 (3d Cir. 1971).[17] Respondent concedes that the deductibility of obligations similar to petitioner's obligations, implemented by Trusts I and II, was allowed in *Lukens Steel Co. v. Commissioner, supra*, but argues that *Lukens* was wrongly decided.[18]

Subsequent to the Third Circuit's affirmance of our decision in *Lukens*, the same issue involving the same liability under an identical SUB plan was litigated and resolved in favor of other taxpayers in *Cyclops Corp. v. United States*, 408 F.Supp. 1287 (W.D. Pa. 1976), appeal docketed, No. 76–2242 (3d Cir. Sept. 22, 1976), dismissed per stipulation Feb. 16, 1977; and *Inland Steel Co. v. United States*, 39 AFTR 2d 77–398, 76–2

---

[15] The regulation, in pertinent part, provides: "Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. * * *"

[16] We have previously found that production and employment in steel and aluminum industries were of a similar cyclical nature.

[17] We note, here, that the delayed payment obligation arising under the 1962 SUB plan, as well as the balance of petitioner's contingent liability under the 1956 SUB plan, was not treated as an accrued expense and/or liability on petitioner's books of account and published financial statements during 1962 and 1963, whereas Lukens' books of account and financial statements respectively showed such amounts as an accrued expense and/or accrued liability. The omission or entry of an item on a taxpayer's books is evidential, and as such, this circumstance may have some bearing on the right to claim a deduction. *Commissioner of Internal Revenue v. Brooklyn R.S. Corp.*, 79 F.2d 833 (2d Cir. 1935) citing *Lucas v. American Code Co.*, 280 U.S. 445 (1930). However, "If a genuine liability has been created, or the identifiable events have occurred which give rise to liability," an item will be deductible "even though there is no entry on the books until a subsequent period." 2 Mertens, Law of Federal Income Taxation, sec. 12.77, p. 334–5 (1974 rev.). In view of our holding, *infra*, we believe all events have occurred to create a genuine liability.

[18] See also Rev. Rule 72–34, 1972–1 C.B. 132; Rev. Rule 76–345, 1976–2 C.B. 134.

USTC par. 9791 (Ct.Cl. Nov. 26, 1976).[19] Respondent's contentions on brief herein, with respect to the SUB plans implemented by Trusts I and II, are substantially similar to his arguments in *Lukens, Cyclops,* and *Inland Steel* and after careful consideration of the record and the aforenoted cases we are, again, unpersuaded and hold for petitioner.[20]

However, with respect to petitioner's obligation under the McCook SUB plan, respondent argues, on brief, that in the event we reaffirm our decision in *Lukens,* amounts calculated under this delayed payment obligation are not deductible since their ultimate payment was not reasonably certain in fact. Respondent contends that the record does not indicate that the rate of calculation of petitioner's liability under the McCook SUB plan (Trust III) was based upon any data derived from petitioner's unemployment experience with the craft unions at the McCook plant, whereas petitioner's obligations under the other SUB plans were based upon unemployment experience. The reason a separate SUB plan was established in 1962 at the McCook plant was that the craft unions had received no benefits under the 1956 SUB plan from contributions made on their behalf by petitioner, and that these benefits were being expended for employees represented by the steelworkers who were on layoff at other plants. The record indicates that petitioner's 1962 and 1963 delayed payment obligations under the McCook SUB plan were not paid into the trust until 1975, and, although the deductibility of an item must be determined in light of the circumstances existing when the obligation was incurred, subsequent events are material in testing the propriety of an estimate. Respondent concludes that the facts indicate the unemployment rate of the craft unions in the McCook plant was markedly different from that of the other unions receiving benefits from Trusts I and II. Petitioner did not attempt to revise the McCook benefit formula to reflect these differences and,

---

[19] The Court of Claims recognized that the issue presented has already been decided against the Government in *Lukens* and *Cyclops* and granted taxpayer's motion for summary judgment. The Government did not apply for certiorari to the Supreme Court.

[20] In view of the recent case law we see no useful purpose in presenting the parties' positions nor commenting thereon. However, appeal in this case lies to the Fourth Circuit Court of Appeals and as appeal of our decision appears likely we have laboriously found and presented herein the facts of this case.

therefore, even the *Lukens'* application of the "all events" test should result in disallowance of petitioner's claimed deductions for the delayed payment obligation calculated under the McCook SUB plan in 1962 and 1963, as there was no reasonable basis to believe such amounts would actually be paid.

We do not agree with respondent. Petitioner's liability for the delayed payment obligation was the same under all the SUB plans. Petitioner and the McCook plant craft unions negotiated and agreed to a separate SUB plan and a separate trust. "Accordingly the existence of petitioner's liability and the amount thereof were fixed during the taxable years even though the time of payment was not. * * * In no event could the contingent liability be canceled by petitioner." *Lukens Steel Co. v. Commissioner,* 52 T.C. at 784, 785. The crucial point is the legal liability to pay someone at some point in time. We cannot say, if the time period for payment were so stretched as to render the ultimate liability a practical nullity, that our conclusion would remain the same. However the record does not so indicate quite such a stretch-out in the instant case. The amounts in issue for 1962 and 1963 were paid into Trust III by 1975. The payout did not occur "decades hence" and such sums were committed to the trust in the year of accrual. See *Lukens Steel Co. v. Commissioner,* 442 F.2d at 1135 (Chief Judge Hastie concurring).

*Decision will be entered for the petitioner.*