CITRUS ORTHOPEDIC MEDICAL GROUP, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8771–77.     Filed June 11, 1979.

---

*H. Bradley Jones* and *Richard Saavedra,* for the petitioner.
*Karl D. Zufelt,* for the respondent.

## OPINION

FEATHERSTON, *Judge:* Respondent determined deficiencies in the amounts of $3,520 and $10,423 in petitioner's Federal income tax for the taxable years ended March 31, 1974, and March 31, 1975, respectively. The issues for decision are whether payments made by petitioner during those years to an educational benefit trust established for the children of certain of petitioner's employees are deductible, and if so, in what taxable years.

The facts have been stipulated.

Citrus Orthopedic Medical Group, Inc. (hereinafter Citrus or petitioner), a California corporation, had its principal place of business in Covina, Calif., when it filed its petition. For the fiscal years ended March 31, 1974, and March 31, 1975 (hereinafter 1974 and 1975) Citrus filed Federal corporate income tax returns with the Internal Revenue Service, Fresno, Calif.

During 1974 and 1975, Citrus' principal source of income was fees for medical services performed by Dr. Charles B. McElwee, Jr. (McElwee) and Dr. Hugh E. Smith (Smith). McElwee and Smith each owned 50 percent of Citrus' stock. In addition, they constituted Citrus' board of directors, were its officers, and were its principal salaried employees.

On March 28, 1974, Citrus established an educational benefit plan the provisions of which were embodied in three documents: "Educational Benefit Plan and Related Trust" (the plan), "Trust Agreement" (the trust), and "Educational Benefit Plan and Trust Adoption Agreement" (the adoption agreement). Under the terms of these documents, each of the qualifying children of Citrus' key employees was to receive cash benefits while attending a college or university. The benefits were intended to cover, at least in part, their education expenses. At all relevant times, McElwee and Smith were Citrus' only key employees.

The plan provided that Citrus would contribute to the trust $16,000 in year 1 (i.e., 1974), $14,000 in year 2 (i.e., 1975), and additional annual amounts for a total period of 15 years. Contributions, which were expected to total $112,000 by year 15, were intended to fund an individual account in the amount of $16,000 for each of McElwee's three and Smith's four children.

The funds in the individual accounts were to be forfeited if the participant's parent terminated his employment with Citrus or if the child did not enroll in an educational institution within the time period allowable under the plan or before he reached the age of 28 years. If a participant's parent should take a position with another employer which has an education benefit plan qualified under section 162,[1] the participant's interest in the account may be transferred to the trustee of the plan maintained by that employer in the "sole and absolute discretion" of the trustee.

Citrus' attorneys were designated as trustees and were purportedly given power to administer the trust, including power to invest and reinvest the trust funds in any type of security or real estate. Nonetheless, as discussed more fully below, a committee, appointed by Citrus' board of directors and composed of McElwee and Smith, had the absolute authority (1) to require the trustee to obtain its written approval before it exercised any of its powers, (2) to direct the trustee in making any investments, and (3) to direct the trustee as to when and to whom benefits were to be paid under the plan.

Citrus' board of directors retained the power to amend and terminate the plan at any time. If the plan failed to satisfy the deductibility requirements of section 162, the contributions and earnings accruing to the trust were to revert to Citrus. Otherwise, the power to amend the plan and trust were not to be used to cause a reversion of the trust assets.

When the plan was established, the oldest qualified child was in the eighth grade in school. The trustee, therefore, did not pay any benefits in 1974 and 1975. Nevertheless, Citrus contributed $16,000 in 1974 and $34,000 in 1975. It deducted those amounts as "Other Deductions" in the respective Federal income tax return for each year. McElwee and Smith did not include any part of

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

the contributions in their 1973, 1974, or 1975 gross incomes as reported on their Federal income tax returns.

In his notice of deficiency, respondent determined that Citrus' claimed deductions of $16,000 and $34,000 for 1974 and 1975, respectively, are not allowable explaining that employer contributions to an employee trust and deferred payment plan are not deductible under section 162.

### 1. Whether Citrus "Paid or Incurred" Business Expenses in 1974 and 1975

Despite the technical elegance of the instruments—the plan, the trust, and the adoption agreement—we agree with respondent that the rights purportedly conferred on the McElwee and Smith children as beneficiaries of the trust were illusory. The provisions of these three documents, read together, show that Citrus did not relinquish control over the deposited funds. One provision of the documents effectively cancels another so that the trustee is only a figurehead. In no sense can it be said that Citrus' disbursements to the trust in 1974 and 1975 were compensation for services "paid or incurred" in those years within the meaning of section 162(a). In reality, as we shall discuss, Citrus' contributions to the trust did not go through a substantial change in economic ownership. Cf. *Audano v. United States*, 428 F.2d 251, 257–259 (5th Cir. 1970); *Furman v. Commissioner*, 381 F.2d 22 (5th Cir. 1967), affg. per curiam 45 T.C. 360 (1966).

By section 3.01 of the trust agreement, the trustee was purportedly given a long list of customary investment and other powers and responsibilities. By a paragraph in the adoption agreement, however, the committee was given "full power to direct the Trustee with regard to investments." Moreover, the investment as well as other powers ostensibly given the trustee were emasculated by another section of the trust agreement as follows:

3.05 *Restriction on Exercise of Powers:* The powers granted to the Trustee under Section 3.01 shall be exercised by the Trustee in its sole discretion. The Committee may, however, at any time and from time to time, by written direction to the Trustee, require the Trustee to obtain the written approval of the Committee before exercising any such powers.

Further, the committee was given the express power to "require the Trustee to invest in, retain, sell or otherwise dispose" of any

investment. Consistent with this limitation on the trustee's investment and management powers, the trust agreement provides that the trustee "shall not be responsible for the collection of any contributions to the Trust Fund"; third parties dealing with the trustee shall be relieved from inquiring into the decision or authority of the trustee or seeing to the application of any money or property delivered to the trustee; and neither—

the Trustee nor any other person shall be under any duty, responsibility or liability to question any such direction of the Committee, or to review any securities or other property, or to make any suggestions to the Committee in connection therewith * * *

Thus, Citrus, through the committee which it appointed, retained complete control and responsibility over the investment of all funds contributed to the trust.

Similarly, the trustee has no real power over the distributions of funds. The trustee in section 3.03 of the trust agreement is required "on the written directions of the Committee, signed by a majority of the then members thereof," to make distributions of funds "to such persons, in such manner, in such amounts and for such purposes as may be specified" in such directions. In directing the trustee, the committee purportedly was to follow the provisions of the plan but, as discussed below, the plan is subject to easy modification at any time. The trustee has "no liability for any distribution made by it pursuant to the directions of the Committee" and has "no duty to make inquiry as to whether any distribution directed by the Committee is made pursuant to the provisions of the related Plan." Citrus, through its committee, in this manner retained complete power over the distribution of the trust funds.

Citrus also retained the right to amend or terminate the trust at any time. One section of the trust agreement states that it is the intention of Citrus that the trust and the plan to which it relates "shall be permanently administered for the exclusive benefit of the Participants, and this Trust is, accordingly, irrevocable, except as to Section 8.03." Significantly, there is no section 8.03 in the trust agreement. The section adds that:

If conditions change, however, this Trust Agreement and the Trust created hereunder may be terminated at any time by the Company [Citrus], and upon such termination, the Trust shall be distributed by the Trustee as and when directed by the Committee, in accordance with the provisions of Section 3.03.

As discussed above, section 3.03 authorizes distributions at the written direction of the committee and absolves the trustee of any obligation to inquire as to whether the directed distribution is consistent with the plan.[2]

The trust agreement authorizes the company to amend the agreement at any time. It contains a provision that it "shall be impossible, for any part [of] the corpus or income of the Trust Fund or any other Trust account" to be used for, or diverted to, purposes other than for the exclusive benefit of the participants, "subject to the qualification in Section 9.03." Section 9.03 of the trust agreement provides:

9.03 *Effect of Disqualification:* It is intended that the Plan qualify as a corporate business expense and payments thereto be deductible under the Internal Revenue Code of 1954 of the United States of America and the State of California. However, if the Plan fails initially to qualify, all contributions, together with any income received or accrued thereon (less any expenses to which the Trustee may be entitled which have not been paid by Company), shall upon the written direction of the Company be returned to the Company, any provisions of this Trust Agreement to the contrary notwithstanding, and it shall then terminate. The Trustee shall then be discharged from all obligations under this Trust.

The trust agreement gives no clue as to the meaning of the provision that "if the Plan fails initially to qualify" the corporation for deductions under the Internal Revenue Code and the laws of the State of California—whether the reference is to an examination by a revenue agent or a conferee, the issuance of a notice of deficiency, a decision of this Court, or a determination by the District Director of Internal Revenue. The plan, however, states that "no Participant shall have any vested right or claim to any assets of the Trust resulting from Company contributions prior to the issuance by the Commissioner of Internal Revenue of a favorable Letter of Determination." It further provides that should funds be disbursed prior to the receipt of such a ruling "then in the event of an unfavorable Ruling by the Commissioner of Internal Revenue then the Participant is obligated to repay such funds to the Trust."

---

[2]The plan states that "the right is reserved by the Company, by action of its Board of Directors, at any time to discontinue the Plan, consistent with the other Sections of this Article." Another section in the article provides that the plan will terminate if Citrus' board of directors adopts a resolution to that effect and gives the trustee 30 days' notice. Upon termination of the plan, the undisbursed funds are to be used for the benefit of eligible children. As in the case of other provisions, however, this provision was subject to amendment or modification.

The stipulated facts do not indicate that Citrus has ever requested a ruling by the Commissioner of Internal Revenue or the District Director or any other official. It seems clear, therefore, that no one has obtained any vested rights under the funds and Citrus is still free to terminate the trust and require all contributed funds to be returned to it. In such circumstances, we do not think that the contributions were "paid or incurred" in 1974 and 1975 within the meaning of section 162(a).

Petitioner argues, citing principally *In Re Ferrall's Estate*, 41 Cal.2d 166, 258 P.2d 1009, 1014–1015 (1953), that Citrus did not retain dominion and control over the trust assets since the California courts will interpose their judicial discretion where a trustee does not act in a manner contemplated by the settlor. That principle has nothing to do with the instant case. Here McElwee and Smith, on behalf of Citrus, purportedly conferred powers on the trustee and benefits on their children as trust beneficiaries. In fact, however, all such powers were rendered meaningless by other provisions conferring powers on the committee which was Citrus' alter ego. And no rights were vested in the children during the years in issue. Citrus could have terminated the trust and reacquired all funds purportedly transferred to the trust before any rights vested in the beneficiaries. The beneficiaries had no rights which the California courts could protect.

### 2. *Alternatively, the Plan is not a Noncompensatory Employee Benefit Plan*

Even if we assume that the contributions to the trust in 1974 and 1975 had economic meaning, Citrus is not entitled to deductions for such contributions in those years. It is stipulated that the plan and related trust did not constitute a "qualified" plan under section 401 or an exempt trust under section 501. The plan was thus a nonqualified one. Section 404(a)(5) provides generally that contributions by an employer to a nonqualified plan are deductible in the year in which "an amount attributable to the contribution is includible in the gross income of employees participating in the plan." Sec. 1.404(a)–12(b)(1), Income Tax Regs. As to the timing of the inclusion of contributions in the employees' gross income, section 1.402(b)–1(a)(1), Income Tax Regs., provides, in general, that contributions to a nonexempt trust shall be included as compensation in the gross income of

the employee for his taxable year during which the contribution is made, "but only to the extent that the employee's interest in such contribution is substantially vested at the time the contribution is made." Where a contribution previously made later becomes substantially vested, it is includable in the employee's income in the year in which his rights under the trust become substantially vested. Sec. 1.402(b)–1(b)(1), Income Tax Regs.

For the reasons discussed in detail above, no rights were vested in McElwee and Smith as employees or in their children during the years in issue. Therefore, Citrus is not entitled to deductions for the trust contributions in those years.

Petitioner argues that section 404(a)(5) does not apply in this case, citing *Latrobe Steel Co. v. Commissioner*, 62 T.C. 456 (1974). That case is distinguishable. It involved a vacation plan provided for in a contract between the taxpayer and the union representing its employees. In concluding that section 404(a)(5) did not apply, this Court emphasized the significant administrative and legislative consideration of the tax treatment of union employee vacation expenses and concluded that the vacation plan was not "similar" to the permissible compensation deferral plans described in section 404(a). We are here dealing with a vastly different problem—an arrangement by the two sole shareholders and key employees of Citrus to provide funds when needed to discharge their parental responsibility for the college educations of their children—an attempt to defer the receipt and taxation of those funds until they were needed. Such a deferral is "similar" in principle to the permissible section 404(a) plans. In effect, Citrus simply set aside a part of its 1974 and 1975 profits for the later education of the McElwee and Smith children in a manner "similar" to the operation of a profit-sharing plan.

Petitioner next argues that, under section 1.162–10(a), Income Tax Regs., the transfers to the trust were fringe benefits, noncompensatory in nature and, therefore, section 404(a)(5) does not apply. We quote from petitioner's brief:

The Plan in this case is an employee benefit plan and not a compensatory arrangement. The Plan lacks the design to transfer property in recognition of or in connection with the performance of services. It is designed simply to

promote and improve employee loyalty, good will, and morale. Consequently, the Plan should not be subject to the Section 83 restrictions.[3]

This argument, when viewed in the light of the facts of the instant case, borders on the ludicrous. McElwee and Smith are two successful physicians. They established Citrus as a professional corporation through which to carry on their medical practice, and practically all of Citrus' income was derived from fees for their services. Each of them owns 50 percent of Citrus' stock, and the two of them constituted its board of directors. The educational plan was administered by a committee appointed by them as Citrus' directors, and at all relevant times they were the only members of the committee. The plan was designed to benefit the children of Citrus' key employees, and Citrus' only key employees were McElwee and Smith.[4] We think it obvious that Citrus' contributions to this plan cannot be dismissed as noncompensatory fringe benefits designed to promote and improve the loyalty, goodwill, and morale of McElwee and Smith. If the transfers to the trust were not illusory, those transfers were compensation for services, and one who earns compensation may not avoid taxation by anticipatory arrangements regardless of their technical elegance. *United States v. Basye*, 410 U.S. 441, 450 (1973).

In *Armantrout v. Commissioner*, 570 F.2d 210 (7th Cir. 1978), affg. per curiam 67 T.C. 996 (1977), an employer paid sums to a trustee who, in turn, paid school expenses for its employees' children to relieve the employees of concern about the high cost of college education for their children. Dealing with the compensatory nature of the payments, the court said (570 F.2d at 212 n. 4):

Section 61 defines gross income as "all income from whatever source derived," including first of all "Compensation for services." Section 83 provides that where property is transferred to any person (here the children) other than the person for whom the services are performed (here Educo), the performer of the services (here the fathers) must pay income tax on amounts calculated

---

[3]In reaching the foregoing conclusion with respect to the timing of the claimed deduction, we do not rely upon "Section 83 restrictions," sec. 83(e)(2), but upon secs. 1.404(a)–12(b)(1) and 1.402(b)–1(b)(1), Income Tax Regs.

[4]In *Reynolds Metals Co. v. Commissioner*, 68 T.C. 943 (1977); *Latrobe Steel Co. v. Commissioner*, 62 T.C. 456 (1974); and *Lukens Steel Co. v. Commissioner*, 52 T.C. 764 (1969), affd. 442 F.2d 1131 (3d Cir. 1971), relied upon by petitioner, the employee benefit plans were instituted as a result of arm's-length bargaining between unions and the employer. As a result of that bargain, the employers were legally bound by contract to make the disputed payments. Here, the payments were made pursuant to a unilateral decision by McElwee and Smith to cover the cost of education for their children.

under Sections 83 and 402(b) of the Internal Revenue Code. Whether the Commissioner uses Section 61 or Section 83, the alleged tax deficiencies would come out the same because they are based entirely on the Educo benefits paid. Nor is the question of liability affected by the choice of Sections given our view of petitioners' compensation * * * because the Educo Plan fits within the terms of compensation for services under Section 61 and may also qualify within the more specific language of Section 83. Therefore, like the Tax Court, we need not choose between the Section 61 and Section 83 routes, nor need we decide whether Section 83 applies only to stock plans. Cf. *Sakol v. Commissioner*, 67 T.C. 986, 989–991 (1977).

We think it is plain that the transfers to the trust in the instant case, if they were completed ones, were additional compensation to McElwee and Smith and the amounts thereof are not deductible in the years here in issue.

To reflect the foregoing,

*Decision will be entered for the respondent.*