LATROBE STEEL COMPANY, A PENNSYLVANIA CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7291–70.    Filed July 3, 1974.

*Dennis I. Meyer,* for the petitioner.
*Louis A. Boxleitner* and *Joseph M. Abele,* for the respondent.

WILES, *Judge:* Respondent has determined the following deficiencies in petitioner's Federal income taxes:

| Years | Deficiencies |
| --- | --- |
| 1964 | $275, 585. 35 |
| 1965 | 460, 435. 40 |

The only issue remaining for our decision is whether that part of the vacation plan provided for in the labor agreement between petitioner and a labor union whereby petitioner's employees were entitled to extended vacation benefits constituted a plan deferring the receipt of compensation within the meaning of section 404(a).

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner Latrobe Steel Co. (hereinafter sometimes referred to as the company) is a Pennsylvania corporation engaged in the business of manufacturing and selling high-speed steels, die steels, mold steels,

carbon tool steels, and other specialty steels. It had its principal place of business at Latrobe, Pa., at the time the petition was filed. Petitioner computes its Federal income under the accrual method of accounting and files its Federal income tax returns on the basis of a calendar year. Petitioner filed its Federal income tax returns for its taxable years 1964 and 1965 with the district director of internal revenue at Pittsburgh, Pa.

Petitioner and the United Steelworkers of America (hereinafter referred to as the union) had entered into a basic labor agreement effective July 26, 1962 (hereinafter referred to as the 1962 agreement). With regard to vacations, the 1962 agreement provided only for regular vacations of from 1 to 4 weeks depending on years of service. The 1962 agreement between petitioner and the union was amended on July 31, 1963, and on October 29, 1963. The purpose of the October 29, 1963, amendment was to adopt a vacation plan that provided for both regular and extended vacation benefits. The 1962 agreement as amended on July 31, 1963, and October 29, 1963, is hereinafter referred to as the amended agreement.

With respect to regular vacations the amended agreement provided in pertinent part that any employee who had 1 or more years of continuous service and had not been absent from work for 6 consecutive months or more in the preceding calendar year would be eligible for a regular vacation as follows:

| Accumulated company continuous service | Weeks of regular vacation |
| --- | --- |
| 1 year but less than 3 years | 1 |
| 3 years but less than 10 years | 2 |
| 10 years but less than 25 years | 3 |
| 25 years or more | 4 |

An employee otherwise eligible to receive regular vacation benefits forfeited the right to receive such benefits if he quit, retired, or was discharged prior to January 1 of the vacation year.

With respect to extended vacations, the amended agreement stated that the purpose of extended vacations was to provide expanded employment opportunities by granting each employee, whose rights became vested, not less than 7 or more than 13 consecutive weeks of time off with 13 weeks of vacation pay once in each 5-year period beginning January 1, 1964. An extended vacation, in any calendar year, would include the regular vacation in that year.

Vesting of an extended vacation would be determined as follows:

1. Fifty percent of all those employees, in order of accumulated continuous service, who were eligible on December 31, 1963, for a regular vacation in 1964, would become entitled to 13 weeks of extended vacation pay on January 1, 1964.

2. Fifty percent of all those employees, in order of accumulated continuous service, who were eligible on December 31, 1964, for a regular vacation in 1965, exclusive of those employees who became vested for the 13 weeks of extended vacation pay in 1964, would be entitled to 13 weeks of extended vacation pay on January 1, 1965.

3. All those employees who were eligible on December 31, 1965, for a regular vacation in 1966, exclusive of those employees who became vested for the 13 weeks of vacation pay in 1964 or 1965 would be entitled to 13 weeks of extended vacation pay on January 1, 1966.

4. In addition, an employee who was not eligible on December 31 of either 1963 or 1964, for a regular vacation in 1964 or 1965, but, who became eligible for such regular vacation during 1964 or 1965, would then be entitled to 13 weeks of extended vacation pay provided his accumulated continuous service was equal to or greater than that of the employee with the least seniority.

5. An employee who had not become entitled to an extended vacation in accordance with paragraphs 1 through 4 above would be entitled to 13 weeks of extended vacation pay when he became eligible for a regular vacation during 1966, 1967, or 1968.

6. In addition, an employee who retired on pension on or after December 31, 1963, and who had not been entitled previously to the 13 weeks of extended vacation pay, would become entitled to such pay upon retirement.

Upon vesting of an extended vacation in accordance with the criteria described above, an employee's rights to 13 weeks of vacation pay became nonforfeitable. In the event of death of an employee who was eligible for such a vacation, the amount of vacation pay to which he would have been entitled would be paid to his wife or his estate. After his rights to 13 weeks of extended vacation pay became vested, an employee would not forfeit this pay if his employment were terminated by reason of resignation or discharge.

Promptly after the union was notified of the company's intentions regarding a plant shutdown for vacations, each eligible employee would be requested to specify the vacation period he desired for his regular vacation. An employee desiring to take his regular vacation prior to April 1 was to notify the company prior to January 1 of the vacation year of the vacation period he desired. Vacations were granted (so far as possible) at the time most desired by employees on a seniority basis but the final right to allotment of vacation periods was exclusively reserved to the company in order to insure the orderly operation of the plant.

Within a period of 90 days, following notification of vesting of an extended vacation, each eligible employee was to notify the company regarding the number of consecutive weeks of time off he desired,

which time could not be less than 7 weeks, nor more than 13 weeks, and he was to designate, at the same time, three periods prior to December 31, 1968, during which he desired to take extended vacation time.

The company was required, to the extent practicable, to schedule employees for extended vacation in approximately equal numbers each year. If such scheduling of extended vacations resulted in undue dilution of experienced employees in a department because of vacations starting in any 1 year, the company was permitted to schedule the starting dates of such extended vacations so that not more than 20 percent of those employees would have such extended vacations starting in any given year.

Under the company's vacation plan, an employee entitled to either a regular or extended vacation would determine at the beginning of the vacation period the number of vacation weeks that he would actually take and the number of weeks he would not take but for which he would be paid. An employee taking an extended vacation would be paid at the beginning of the extended vacation period for the entire 13 weeks. Some employees expended this payment in a manner so that during the last several weeks of the extended vacation period they were without funds. Other employees were not accustomed to such a long vacation and became bored. As a consequence, a number of employees decided to take an extended vacation of less than the full 13 weeks and be paid for the weeks that were not actually taken. This gave such employees sufficient funds for a good vacation during the period that they were actually off.

Prior to 1964, the average vacation of an employee was approximately 3 weeks. Since an extended vacation included the regular vacation of an employee, the effect of the amended agreement was to increase the average vacation of each employee by approximately 10 weeks during the 5-year period of the amended agreement. The extended vacation plan had the effect of favoring the younger employees. For example, a senior employee entitled to 4 weeks of regular vacation would only be entitled to 9 weeks of extended vacation as compared to a new employee entitled to 1 week of regular vacation who received 12 weeks of extended vacation.

An average employee who received extended vacation pay in the year 1964 received between $1,700 to $1,800, or 13 weeks of pay, at the start of his vacation period. He would take about 9 weeks of the possible 13 weeks as a vacation. He would return to work at the end of the ninth week instead of taking an additional 4 weeks of vacation. Similarly, an average employee who received extended vacation pay in 1965 or 1966, would take about 9 weeks of the possible 13 weeks as a vacation, would return to work at the end of the ninth week. Petitioner had no

policy that would defer the extended vacation benefits of an employee beyond the first year in which the employee became entitled to take an extended vacation.

The number of employees under the amended agreement, the number of employees entitled to regular vacation, the number of employees entitled to extended vacation, and the number of employees who took extended vacations in the calendar years 1964 through 1966 were as follows:

| Year | Number of employees under agreement | Number of employees entitled to regular vacation | Number of employees entitled to extended vacation | Number of employees who took extended vacation |
|---|---|---|---|---|
| 1964 | 1,279 | 1,242 | 621 | 436 |
| 1965 | 1,342 | 1,286 | 311 | 258 |
| 1966 | 1,479 | 1,342 | 410 | 327 |

The number of total vacation weeks paid both regular and extended, the number of extended vacation weeks taken, and the number of extended vacation weeks paid for but not taken, in the years 1964, 1965, and 1966 were as follows:

| Year | Total vacation weeks paid—regular and extended | Number of extended vacation weeks taken [1] | Number of extended vacation weeks paid for but not taken [1] |
|---|---|---|---|
| 1964 | 7,259 | 2,125 | 1,802 |
| 1965 | 5,811 | 1,345 | 924 |
| 1966 | 6,972 | 1,901 | 1,337 |

[1] Does not include the regular vacation portion of the extended vacation.

The total vacation payments both regular and extended, the total extended vacation payments, and the total extended vacation payments for weeks not taken in the years 1964, 1965, and 1966 were as follows:

| Year | Total vacation payments— regular and extended | Total extended vacation payments [1] | Total extended vacation payments for weeks not taken [1] |
|---|---|---|---|
| 1964 | $1,031,435 | $533,566 | $244,336 |
| 1965 | 875,359 | 324,174 | 132,233 |
| 1966 | 1,100,003 | 464,204 | 194,870 |

[1] Does not include the regular vacation portion of the extended vacation.

A number of petitioner's employees received their extended vacation pay in a year other than the one in which the deduction was claimed therefor. There were 185 employees who were entitled to receive extended vacation pay in the year 1964 and who did not receive

such pay in 1964. Similarly, there were 53 employees in 1965 and 83 employees in 1966 who were entitled to receive extended vacation pay for the first time in said respective years, but who did not receive such pay in the initial year of eligibility.

Petitioner accrued as a liability and deducted on its Federal income tax returns for 1964 and 1965 the amounts of $1,197,752 and $662,252, respectively, with respect to the extended vacations provided for in the amended agreement. No part of said amounts was set aside by petitioner in a separate fund or trust account.

### OPINION

The issue for our decision is whether that part of the vacation plan provided for in the labor agreement between petitioner and a labor union whereby petitioner's employees are entitled to extended vacation benefits constitutes a plan deferring the receipt of compensation within the meaning of section 404(a). The petitioner contends that the extended vacation plan is not a deferred-compensation plan and that accrued extended vacation pay is deductible in the year of accrual under section 162 and section 1.162–10(a), Income Tax Regs., which provides that amounts paid or accrued within the taxable year for vacations are deductible under section 162(a) if they are ordinary and necessary expenses of the trade or business. Section 1.162–10(a), Income Tax Regs., further provides, however, that such amounts shall not be deductible under section 162(a) if, under any circumstances, they may be used to provide benefits under a stock bonus, pension, annuity, profit-sharing, or other deferred-compensation plan of the type referred to in section 404(a). Referring to this limitation in the regulations, the respondent contends that the extended vacation plan is a deferred-compensation plan as described in section 404(a) so that the accrued vacation pay may not be deducted until actually paid as required by section 404(a)(5). In the event that this Court holds that section 404 does not control the deduction of the vacation pay in issue, the respondent concedes that the petitioner is entitled to deduct these amounts pursuant to section 162.

Section 404 provides in part:

(a) GENERAL RULE.—If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year:

\*     \*     \*     \*     \*     \*     \*

(5) OTHER PLANS.—In the taxable year when paid, if the plan is not one included in paragraph (1), (2), or (3), if the employees' rights to or derived from such employer's contribution or such compensation are nonforfeitable at the time the contribution or compensation is paid.

\* \* \* \* \* \* \*

(b) METHOD OF CONTRIBUTION, ETC., HAVING THE EFFECT OF A PLAN.—If there is no plan but a method of employer contributions or compensation has the effect of a stock bonus, pension, profit-sharing, or annuity plan, or similar plan deferring the receipt of compensation, subsection (a) shall apply as if there were such a plan.

The respondent argues that this section applies whenever compensation is paid or accrued on account of any employee under a plan that has the effect of deferring any compensation. He argues that this section applies in the present case because the extended vacation plan provides for deferment of compensation for more than 1 year in many cases. Relying on legislative history, to show the intent of Congress, the petitioner contends that section 404(a) applies only to stock bonus, pension, profit-sharing, or annuity plans or similar plans that defer the receipt of compensation. The petitioner argues that the vacation plan in issue is not similar to the enumerated plans and that it therefore should not be treated in accordance with section 404(a) but rather in accordance with section 162.

Although a literal interpretation of the first sentence of section 404(a) would appear to support the position of respondent, we are not confined to such a literal reading in order to construe the intended meaning of this section. Rather, it is our duty to give effect to the intent of Congress by interpreting the general words of a section with reference to the whole statute, the purpose for which it was enacted, and its antecedent history. *Helvering* v. *N.Y. Trust Co.*, 292 U.S. 455 (1934). Moreover, each subdivision of a section must be construed with regard to the other provisions of the statute. *Barnes Transportation Co.*, 14 T.C. 123 (1950).

The predecessor of section 404 was originally enacted in the Revenue Act of 1942 as an amendment to section 23(p) of the Internal Revenue Code of 1939. As originally introduced in the House, the bill provided in part as follows:

If *compensation* for personal services rendered is paid or accrued on account of any employee under a stock bonus, pension, profit-sharing, or annuity plan, or *similar plan* deferring the receipt of such compensation, then such compensation shall not be deductible under subsection (a) but shall be deductible, if deductible under subsection (a) without regard to this subsection, under this subsection but only to the following extent:

    (A) \* \* \*
    (B) \* \* \*
    (C) \* \* \*
    (D) \* \* \*
    (E) \* \* \*

If there is no plan but the method of compensating for personal services has the effect of a stock bonus, pension, profit-sharing, or annuity plan, or *similar plan* deferring the receipt of compensation, this paragraph shall apply as if there were such a plan.

[Emphasis added. H.R. 7378, 77th Cong., 2d Sess., pp. 113–116 (1942).]

With regard to the proposed amendment of section 23(p), the report of the Ways and Means Committee stated:

Section 23(p) is also applicable to amounts paid or accrued on account of any employee under a stock bonus, pension, profit-sharing, or annuity plan, or *similar plan* deferring the receipt of such compensation. * * *

    *       *       *       *       *       *       *

If an employer on the accrual basis defers paying any compensation to the employee until a later year or years under an arrangement having the effect of a stock bonus, pension, profit-sharing, or annuity plan, or *similar plan* deferring the receipt of compensation, he will not be allowed a deduction until the year in which the compensation is paid.* * *

[Emphasis added. H. Rept. No. 2333, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 451–452.]

As ultimately enacted after revision by the Senate, section 23(p) provided in part as follows:

If *contributions* are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under subsection (a) but shall be deductible, if deductible under subsection (a) without regard to this subsection, under this subsection but only to the following extent:

  (A) * * *
  (B) * * *
  (C) * * *
  (D) * * *
  (E) * * *
  (F) * * *

If there is no plan but a method of employer contributions or compensation has the effect of a stock bonus, pension, profit-sharing, or annuity plan, or *similar plan* deferring the receipt of compensation, this paragraph shall apply as if there were such a plan.

[Emphasis added.]

The reasons for the revisions in this portion of the bill are explained in the report of the Senate Finance Committee:

The House bill is revised to refer to the employer's payments to or under stock bonus, pension, profit-sharing, or annuity plans as contributions instead of as compensation. Reference to them as contributions is in accord with general usage and the provisions of section 165. * * * [S. Rept. No. 1631, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 607.]

These quotations from the legislative history establish that the bill as originally introduced would have limited the application of section 23(p) to the four enumerated plans and similar plans that deferred the receipt of compensation. In order to prevent potential abuse, the

original bill also provided that section 23(p) would apply to methods of contributions that had the effect of the four enumerated plans and similar plans. The bill as revised by the Senate retained the phrase "similar plan" with regard to application of section 23(p) to methods of contributions that had the effect of deferring compensation. The phrase "similar plan" was not retained, however, with regard to application of section 23(p) to formal plans deferring compensation.

We conclude that deletion of the words "similar plan" was not the result of an intention on the part of the Senate to require that section 23(p) apply to all plans that result in the deferral of compensation. To the contrary, the stated purpose for the change in language in this portion of the section was to refer to employer's payments to plans as contributions and thereby conform this terminology to that used elsewhere in the Code. Thus, we are not confronted with a situation in which the Senate has made a change in a House version of a revenue bill without any reason for such change being described in the congressional reports. See, e.g., *Albert L. Dougherty*, 60 T.C. 917 (1973). Because this revision did not reflect an intent to change the extent of application of section 23(p) as proposed by the House, we conclude that the phrase "a plan deferring the receipt of compensation" contained in the first sentence of section 23(p) should be interpreted to mean a similar plan deferring the receipt of compensation.

We believe that retention by the Senate of the phrase "similar plan" in the last sentence of section 23(p)(1) relating to taxation of methods having the effect of a plan provides further support for our conclusion. To conclude otherwise would result in the inconsistency of subjecting all formal deferred-compensation plans to the strict deduction rules of section 23(p)(1) but permitting a plan not similar to the four enumerated plans to escape those strict rules by simply transforming that plan to a method of contributions having the effect of a plan.

Having concluded that a plan deferring the receipt of compensation is subject to the rules of section 404(a) only if it is similar to the four types of plans enumerated, we must determine whether the vacation plan in issue is similar to a stock bonus, pension, profit-sharing, or annuity plan. The substance of both a pension and an annuity plan is that they are designed to provide employees with actuarially determinable benefits upon retirement. Secs. 1.401–1(b)(1)(i) and 1.404(a)–3(a), Income Tax Regs. The substance of both a profit-sharing and stock bonus plan is that they are designed to grant employees a share of the employer's profits. Pension and annuity plans differ from profit-sharing and stock bonus plans in that the former provide actuarially determinable benefits whereas the latter, by definition and

by reason of the requirement that contributions be made only in case of employer profits, may not provide for such benefits.

Although the extended vacation plan presently in issue results in the deferral of compensation, we do not find that this plan is similar to a stock bonus, pension, profit-sharing, or annuity plan. The plan is unlike either a pension or annuity plan since it is not designed to provide benefits to employees upon retirement. Furthermore, the plan is unlike a profit-sharing or stock bonus plan since it is not designed to grant employees a share of the employer's profits and thereby create an incentive to contribute to the success of the employer. The compensation received by an individual while on vacation is measured neither by reference to retirement needs nor employer profits. We therefore hold that the extended vacation plan in issue is not subject to the rules of section 404 but rather is controlled by section 162.

The Commissioner has never stated in his published rulings that a vacation plan constitutes a deferred-compensation plan so that the employer may deduct vacation pay only in the year of actual payment. On the contrary, the Commissioner has issued rulings that allowed the employer to accrue vacation pay. In Rev. Rul. 54–608, 1954–2 C.B. 8, the Commissioner reconsidered I.T. 3956, 1949–1 C.B. 78, in which written agreements with a labor union provided that a vacation with pay was to be granted during the current calendar year to each employee who rendered compensated service on not less than 160 days during the preceding calendar year. The taxpayer filed its returns on a calendar year basis. Under the agreements, vacations were to be taken between January 1 and December 31. In I.T. 3956 the Commissioner held that the employer's liability for vacation pay accrued as of the end of the taxable year with respect to which the employees qualified for a vacation with pay during the succeeding year by reason of having rendered the necessary qualifying service. In Rev. Rul. 54–608 the Commissioner changed this rule to provide that an employer is entitled to deduct vacation pay in the year when the fact of liability to a specific person has been clearly established and the amount of the liability to each individual is capable of computation with reasonable accuracy. Although Rev. Rul. 54–608 narrowed the circumstances in which an employer could accrue vacation pay, the fact that it continued to allow accrual contradicts the present contentions of the respondent that deductions of compensation paid under the extended vacation plan must be determined pursuant to section 404(a).

Respondent's position with regard to the apparent inconsistency in his treatment of vacation plans in published rulings and the treatment proposed in the present case is that, although allowance of a deduction for accrual of vacation pay has been a longstanding practice, it has not been extended to deferrals of vacation pay more than

1 year after the accrual. This position presumably refers to the factual situation in I.T. 3956, in which the vacation with pay earned by an employee during a prior year was required to be taken during the current calendar year. We find this reasoning unpersuasive. We have found no legislative history supporting the respondent's distinction between vacation plans that defer compensation for 1 year and those that in some instances defer compensation for more than 1 year. Furthermore, the respondent has offered no rationale to support the relevance of this distinction.

The reaction of Congress to the issuance of Rev. Rul. 54–608 provides further support for our conclusion that a vacation plan is not a deferred-compensation plan within the intendment of section 404. In 1958, Congress enacted section 97 of the Technical Amendments Act of 1958, Pub. L. No. 85–866, 1958–3 C.B. 320, which provided:

> Deduction under section 162 of the Internal Revenue Code of 1954 for accrued vacation pay, computed in accordance with the method of accounting consistently followed by the taxpayer in arriving at such deduction, shall not be denied * * * solely by reason of the fact that [the requirements of Rev. Rul. 54–608 have not been met] * * * if at the time of the accrual the employee in respect of whom the vacation pay is accrued has performed the qualifying service necessary under a plan or policy * * * which provides for vacations with pay to qualified employees.

Certainly Congress would not have enacted a provision setting forth certain instances in which accrued vacation pay could be deducted under section 162 if it had intended that all vacation plans be treated as deferred-compensation plans under section 404(a), contributions to which are specifically excluded from the coverage of section 162.

An additional indication of congressional intent is contained in the legislative history of section 462, which was enacted in 1954. Section 462 provided for the establishment of reserves for estimated expenses so that all determinable expenses relating to income reported in a given year could be deducted in that same year. The purpose of this provision was to conform tax treatment of expenses more closely to the treatment accorded under generally accepted accounting principles. The legislative history lists vacation pay as one of the items for which a reserve might be set up. See S. Rept. No. 1622, 83d Cong., 2d Sess., p. 305 (1954). The effect of the establishment of such a reserve would be to allow the accrual of vacation pay under section 162. This suggestion by Congress that accrual of vacation pay is permissible further supports our conclusion that Congress did not intend that vacation plan contributions are deductible only under section 404, which would deny such an accrual. Although section 462 was repealed in 1955, its repeal does not negate our conclusion since it was based solely on estimates of anticipated revenue loss and not on a disclaimer by Congress of the principles contained therein.

We have discovered no prior case law authority that resolves the precise issue before us. We believe, however, that our conclusion finds support in *New York Post Corp.*, 40 T.C. 882 (1963), in which we held that section 404 applied to payments made in accordance with a union contract to employees upon voluntary termination of employment after becoming 65 years of age or completing 25 years of service. We stated that benefits in the nature of retirement or death benefits are the kind of thing that the statute is concerned with. We concluded that the payments there in issue, being in the nature of retirement benefits, were the type of deferred compensation that Congress had in mind when it provided that such compensation would not be deductible under section 162 but rather would be deductible under section 404. Thus, we implicitly recognized that Congress did not intend that all types of plans that resulted in deferring compensation be subject to the rules provided in section 404.

In support of his position, respondent cites *New York Seven-Up Bottling Co.*, 50 T.C. 391 (1968), in which we held that section 404(a) prohibited an employer from deducting unpaid severance pay liability incurred pursuant to a union contract. In *New York Seven-Up* the employer and the union entered into an agreement providing that, after 5 years of continuous service, any employee whose employment was terminated would be entitled to 1 week of pay for each year of service. This agreement was negotiated because some of the tasks performed by the employees were physically strenuous, thereby causing a high turnover rate. The facts in *New York Seven-Up* are distinguishable from those in the present case since the severance pay plan resulted in the payment of benefits when an employee terminated his employment. Thus, the plan in *New York Seven-Up* was similar to a pension plan in that the right to receive benefits vested after a certain term of employment, the extent of benefits was related to years of service, and the receipt of benefits by the employee would not begin until after termination of his employment.

Although the facts in *New York Seven-Up* are distinguishable from those in the present case, this Court made the statement in *New York Seven-Up* that section 404(a) is not limited in its application to pension, profit-sharing, stock bonus, and annuity plans or to similar plans. Having concluded upon reconsideration that this interpretation would extend the scope of section 404(a) beyond that intended by Congress, we will not adhere to our former interpretation of section 404(a) as expressed in *New York Seven-Up* to the extent it is inconsistent with the conclusions expressed herein.

Reviewed by the Court.

*Decision will be entered under Rule 155.*

RAUM, *J.*, concurs in the result.

Fay, *J.*, concurring: I concur with the result in the majority opinion. I must respectively dissent, however, from the reasoning by which the majority arrived at its conclusion.

Although both petitioner and respondent here argued that section 404 applied to the extended vacation plan in this matter, I can see no reason why this Court chose to enter into that discussion. Congress has clearly indicated that vacation benefits are governed by the rules of section 162. Any reference to section 404 is not only unnecessary but inappropriate under these facts.

The majority has aptly pointed out that Congress intended the deduction for vacation benefits to be within the purview of section 162. See sec. 97 of the Technical Amendments Act of 1958, Pub. L. 85-866, and its subsequent reenactments to include any taxable year ending before January 1, 1973. See also S. Rept. No. 92-1290, 92d Cong., 2d Sess. (1972), 1972-2 C.B. 733. See also S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 305 (1954), indicating that vacation pay is one of the items for which a reserve may be set up under section 462. There is no reason to repeat that discussion here. The various legislative reports which indicate that section 162 controls the deduction of vacation benefits do not mention or consider a potential problem with the provisions of section 404. The issue presented here is therefore easily resolved by a proper application of section 162, obviating any analysis of the applicability of section 404 to vacation benefits.

The majority, however, was motivated to approach this matter by first considering the applicability of section 404, which I believe to be unwarranted.[1] They would have us adopt a rather strict and limiting "similar test" (similar to a stock bonus, pension, profit-sharing, or annuity plan), to determine the applicability of section 404 to various methods of deferring compensation. I find this "similar test" to be erroneous in that it unduly narrows the restrictions Congress originally intended when it enacted this section.

Congress has clearly indicated that the purpose of enacting section 404 and its predecessors was to encourage employers to adopt qualified[2] methods of deferring compensation for its employees. See H. Rept. No. 2333, to accompany H.R. 7378 (Pub. L. No. 753), 77th Cong., 2d Sess. (1942). To this end, section 404(a)(5) provides a less desirable treatment to employers who devise methods of deferring

---

[1] Indeed, no matter what conclusion the majority reached in its theoretical discussion of the parameters of sec. 404, the vacation benefits before us are still within the scope of sec. 162. Therefore that portion of the majority opinion is not essential to the true holding in this case.

[2] See sec. 401.

compensation which are not qualified.[3] To restrict the scope of section 404, as the majority would have us do, would defeat the express purposes for which it was enacted.

Further, I believe the majority's gratuitous discussion of section 404 may haunt this Court in the future. The genius of the human mind will undoubtedly be prolific in this area. I anticipate practitioners devising an incalculable number of unqualified arrangements which will clearly have the effect of deferring compensation, yet escaping the clutches of section 404 by not conforming to the "similar test." The impact of the "similar test" advocated by the majority would permit ready evasion of our revenue laws. The potential for abuse in this area is enormous.

In addition, it will be very difficult for the tax bar to ascertain from the majority opinion what standards this Court will adopt in determining what is, or is not, similar.[4] In view of this uncertainty, Congress may deem it necessary to clarify its position as to the applicability of section 404 to various methods of deferring compensation. Until such time, however, that the standards for applicability do become clear, taxpayers and their planners face an uncertain and haphazard road in planning their affairs.

TANNENWALD and QUEALY, *JJ.*, agree with this concurring opinion.

---

[3] Sec. 404(a)(5) provides presently:
(5) OTHER PLANS.—If the plan is not one included in paragraph (1), (2), or (3), in the taxable year in which an amount attributable to the contribution is includible in the gross income of employees participating in the plan, but, in the case of a plan in which more than one employee participates only if separate accounts are maintained for each employee.

[4] See *New York Seven-Up Bottling Co.*, 50 T.C. 391 (1968), which the majority attempts to fit within its "similar test." As the trier of fact in *New York Seven-Up Bottling Co., supra,* it is clear to me that the deferred-compensation arrangement therein is not "similar to a pension plan," nor does it resemble the other plans enumerated in sec. 404.