GRANT-JACOBY, INC., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1159–77, 7236–77—7239–77.   Filed January 16, 1980.

*Paul A. Teschner*, for the petitioners.
*Steven S. Brown*, for the respondent.

SIMPSON, *Judge:* The Commissioner determined the following deficiencies in the petitioners' Federal income taxes:

| Petitioners | Taxable year ending | Deficiency |
|---|---|---|
| Grant-Jacoby, Inc | 8/31/73 | $5,618 |
| | 8/31/74 | 8,542 |
| Charles A. Norris | 12/31/73 | 480 |
| | 12/31/74 | 1,477 |
| Robert Krewer and Dolores Krewer | 12/31/73 | 405 |
| | 12/31/74 | 927 |
| Robert Lavender and Sharon Lavender | 12/31/74 | 370 |
| Robert L. Flink and Doris Flink | 12/31/73 | 1,765 |
| | 12/31/74 | 873 |

The issues for decision are: (1) Whether distributions under an

---

[1] Cases of the following petitioners are consolidated herewith: Charles A. Norris, docket No. 7236–77; Robert Krewer and Dolores Krewer, docket No. 7237–77; Robert Lavender and Sharon Lavender, docket No. 7238–77; Robert L. Flink and Doris Flink, docket No. 7239–77.

employer-sponsored plan providing for payment of the educational expenses of children of certain key employees represent income received by such employees as dividends or compensation; and (2) if such distributions represent compensation, whether the deductibility of the employer contributions under the plan is governed by section 162(a) of the Internal Revenue Code of 1954[2] or by section 404(a)(5). The resolution of the latter issue will determine whether such contributions are deductible when made or when the distributions are received by the children.

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Charles A. Norris and Robert Lavender and Sharon Lavender (husband and wife), all maintained their legal residences in Chicago, Ill., at the time they filed their petitions in this case. The petitioners, Robert Krewer and Dolores Krewer, husband and wife, maintained their legal residence in Mt. Prospect, Ill., at the time they filed their petition in this case. The petitioners, Robert L. Flink and Doris Flink, husband and wife, maintained their legal residence in Lake Forest, Ill., at the time they filed their petition in this case. The petitioner, Grant-Jacoby, Inc. (Grant or the company), is a Delaware corporation which had its principal place of business in Chicago, Ill., at the time it filed its petition in this case. Mr. Norris filed his individual Federal income tax returns for 1973 and 1974 with the Internal Revenue Service Center, Kansas City, Mo. Mr. and Mrs. Krewer and Mr. and Mrs. Flink filed their joint Federal income tax returns for 1973 and 1974 with the Internal Revenue Service Center, Kansas City, Mo. Mr. and Mrs. Lavender filed their joint Federal income tax return for 1974 with the Internal Revenue Service Center, Kansas City, Mo. Grant used a taxable year ending August 31, and we shall identify its taxable year by the calendar year in which it ends. It filed its corporate Federal income tax returns for 1973 and 1974 with the Internal Revenue Service Center, Kansas City, Mo. Messrs. Norris, Krewer,

---

[2]All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise indicated.

Lavender, and Flink will sometimes be referred to as the petitioners.

Throughout the years in issue and up to the time of the trial in this case, Grant was engaged in the advertising business. It emphasized business and corporate communications in the field of annual reporting. The company employed about 50 or 60 people during the years in issue.

The petitioners were all executive employees of Grant. During 1973 and 1974, Grant had six officers, who were:

Robert L. Flink.............. President
Robert Krewer .............. Executive vice president
William Harkins ............. Vice president
Bruce I. Carlson............ Vice president
Charles A. Norris .......... Vice president
Robert Lavender............ Vice president

The members of the board of directors of Grant during such years were Robert L. Flink, Robert Krewer, Charles A. Norris, Bruce I. Carlson, Robert Lavender, and Walter O. Grant. The shareholders of Grant during such years and the number and percentage of shares owned by each of them were as follows:

|  | 1973 | | 1974 | |
| --- | --- | --- | --- | --- |
|  | Number of shares owed | Percent of issued stock | Number of shares owned | Percent of issued stock |
| Robert L. Flink | 1,380 | 29 | 1,380 | 27 |
| Bruce I. Carlson | 850 | 18 | 850 | 17 |
| Robert Krewer | 850 | 18 | 850 | 17 |
| Charles A. Norris | 850 | 18 | 850 | 17 |
| Robert Lavender | 750 | 16 | 750 | 15 |
| William Harkins | 0 | 0 | 300 | 6 |
| Hiroki Mizushima | 0 | 0 | 100 | 2 |
| Total shares | 4,680 | | 5,080 | |

As a means of remaining competitive in the advertising business, and of attracting new talent to the company and maintaining its top creative employees, the board of directors of Grant decided to adopt an educational benefit plan for certain employees. The officers of the company had been considering various ways of maintaining the loyalty of its important employees, and its public accounting firm recommended the adoption of such a plan as a means of helping to tie the most valuable employees to the company. On August 27, 1973, Grant entered into an agreement with Educo, Inc. (Educo), whereby Educo would administer an "Educo plan" (the plan) which would

provide funds for the college education of the children of certain Grant employees, and the board of directors approved the adoption of the plan on August 30, 1973.

Educo, a Delaware corporation organized in 1967, has been engaged since its inception in designing, implementing, and administering college educational benefit plans for corporate employers. In December 1969, Educo entered into a trust agreement with the Continental Illinois National Bank & Trust Co. of Chicago (the trustee) with respect to the funding of Educo plans. Under the terms of the plan adopted by Grant, the company agreed to make payments to the trustee of the plan in accordance with the amounts determined by Grant and Educo. The trustee would hold and disburse the funds pursuant to the plan, and the contributions made by Grant were not refundable to it under any circumstances.

The board of directors of Grant designated the employees who were eligible to have their children participate in the plan. Such employees were selected on the basis of their value to the company as determined by the board, and an employee was not included if his services, in the opinion of the board, could be replaced. Those employees who were not eligible were not informed of the plan. There was no limit on the number of children of an eligible employee who could participate in the plan. However, if an eligible employee terminated his employment with Grant by reason other than retirement, death, or disability, then the children of such employee could no longer receive benefits under the plan. The only employees of Grant who were eligible under the plan from the time the company adopted the plan in 1973 through August of 1977 were: Bruce I. Carlson, Robert L. Flink, Robert Krewer, Robert Lavender, and Charles A. Norris.

In order to receive benefits under Grant's educational plan, a child of an eligible employee had to be accepted by an accredited school and had to maintain a level of performance sufficient to stay in school. The child did not have to pursue any particular course of study, nor was a child required to show financial need in order to be selected; a child had selected to participate in the plan solely because of the father's employment with Grant. The expenses which were covered under the plan included those for tuition, books, meals, lodging, medical care, and any other expense which Grant deemed necessary, reasonable, and related

to the education of the child. To receive reimbursement for educational expenses under the plan, the child submitted a request for payment directly to Educo, and Educo requested the trustee to issue a check either to the child or to the educational institution attended by the child. A child of an eligible employee was required to use some of the educational funds available to him or her before reaching the age of 21 or within 4 years after completing the 12th grade of school. The participation of any child under the plan terminated after he or she attained the age of 30 years.

Under the terms of its agreement with Educo, Grant's plan would terminate if the company failed to make payments to the trustee, if there were no longer any child or children to be covered under the plan, or if Grant elected to terminate the agreement upon 30 days written notice to Educo. Any amounts remaining in the trust at the termination of the plan were to be applied to any unpaid educational expenses incurred before such termination, or were to be distributed on a pro rata basis to the children enrolled in the plan at that time, or to a child or children selected by Grant, or to any qualifying school, hospital, or charity.

The board of directors of Grant established the maximum benefits payable to a child and the contributions to be made by Grant under the plan. The original agreement executed by Grant provided for total benefits of $8,000 per child, with a maximum of $2,000 distributable per year. On July 12, 1974, Grant executed a new enrollment schedule which increased the total benefits per child to $12,000, with a maximum of $3,000 distributable per year.[3] The company increased its contributions to the trust to cover the increased benefits under the plan. Both the original and subsequent enrollment schedules executed by Grant provided that it would make payments of specified amounts to the trustee from 1973 through 1988. The new enrollment schedule provided for payments by Grant in the following amounts:

---

[3]At the time the original agreement was executed, two of the participating children were in the 15th year of school, and one child was in the 14th year of school. Accordingly, such children were provided with maximum benefits of $4,000 and $6,000, respectively. When Grant executed the new enrollment schedule in 1974, the maximum benefits for such children were prorated accordingly.

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1974 ...... | $17,796 | 1982 ...... | $12,600 |
| 1975 ...... | 19,150 | 1983 ...... | 9,450 |
| 1976 ...... | 18,900 | 1984 ...... | 3,150 |
| 1977 ...... | 17,325 | 1985 ...... | 3,150 |
| 1978 ...... | 17,325 | 1986 ...... | 3,150 |
| 1979 ...... | 16,800 | 1987 ...... | 3,150 |
| 1980 ...... | 16,800 | 1988 ...... | 3,150 |
| 1981 ...... | 16,800 | | |

Grant contributed $11,704 to the plan in 1973 and $17,796 in 1974.

The children of the petitioners who participated in the Grant educational plan received the following amounts during the years in issue:

| Petitioner | Child | 1973 | 1974 |
|------------|-------|------|------|
| Charles A. Norris ........ | Bruce | $1,000.00 | $2,953 |
| Robert Krewer ........... | Kathleen | 0 | 100 |
| | Christine | 1,124.00 | 2,225 |
| Robert Lavender ......... | Robin | 0 | 1,027 |
| Robert L. Flink .......... | Toren | 1,690.55 | 175 |
| | Richard | 1,842.00 | 1,570 |

The petitioners did not include the amounts received by their children under the plan as income on their Federal income tax returns during the years in issue. With only two exceptions, each child was over the age of 18 at the time of receiving the first payment under the plan.[4] However, each of the petitioners claimed each child who received such payments as a dependent during the years in issue.

Grant has used the plan as part of its recruitment program to obtain talented employees. In 1977, the company informed Richard W. Scott, whom it was interested in hiring, that his children could participate in the plan if he worked for Grant. Mr. Scott subsequently went to work for the company, and the participation of his children in its educational plan was part of his reason for doing so. Mr. Scott was not a shareholder of Grant as of August 31, 1977, even though, later in that year, his son received disbursements under the plan. Moreover, as of the time

[4]Kathleen Krewer was 17 when she received $100 from the plan on 11/22/74; Robin Lavender turned 18 years old 2 days after the payment she received on 8/8/74.

of trial, the top employees at Grant, who were eligible under the plan since its adoption, have remained with the company. However, none of the petitioners could have bargained with the company to receive a larger salary in place of his eligibility in the plan, and none of the petitioners received a decrease in salary because of such eligibility. The salaries of the executive employees of Grant, including the petitioners, are established by the president and the board of directors of the company. Grant has never declared a dividend since its incorporation.

Grant had taxable income of $122,702 in 1973 and $151,653 in 1974. For its 10 years ending in 1977, Grant's books and records show that it had net income (or loss) and retained earnings at the end of the year as follows:

| Year | Net income (or loss) | Retained earnings |
|------|------|------|
| 1968 | $49,000 | $127,000 |
| 1969 | 86,000 | 113,000 |
| 1970 | 94,000 | 207,000 |
| 1971 | 59,000 | 47,000 |
| 1972 | 31,000 | 78,000 |
| 1973 | 62,000 | 140,000 |
| 1974 | 82,000 | 222,000 |
| 1975 | (97,000) | 125,000 |
| 1976 | (17,000) | 105,000 |
| 1977 | 12,000 | 117,000 |

On its corporate Federal income tax returns for the years in issue, Grant deducted as business expenses the amounts it contributed to the trustee under its educational plan. In his statutory notice of deficiency to Grant, the Commissioner disallowed such deductions. In his notices of deficiencies to the petitioners, the Commissioner determined that the amounts received by their children under the plan constituted unreported dividends from Grant. In the alternative, he determined that such amounts were unreported compensation from the company.

OPINION

First, we shall consider whether the petitioners are taxable on the distributions made to their children under Grant's Educo plan. The Commissioner contends that such distributions are taxable to the petitioners either as dividends or as compensation. The petitioners maintain that such distributions do not represent

income received by them in any event and that such distributions are neither dividends nor additional compensation.

*Armantrout v. Commissioner,* 67 T.C. 996 (1977), affd. per curiam 570 F.2d 210 (7th Cir. 1978), involved a similar Educo plan, and we held that the distributions under such plan constituted additional compensation received by the employees who were the fathers of the children receiving the distributions. Our holding was based on the findings that the right to receive the benefits was linked to the continued employment of the father, that the eligibility of an employee to have the benefits paid to his children depended upon the value of the services performed by the employee, that the plan was adopted to provide greater motivation for key employees, and that the availability of the plan was used to recruit desired employees. In part, we said:

It is fundamental that anticipatory arrangements designed to deflect income away from the proper taxpayer will not be given effect to avoid tax liability. *United States v. Basye,* 410 U.S. 441 (1973); *Lucas v. Earl,* 281 U.S. 111 (1930). In substance, by commencing or continuing to be employed by Hamlin, petitioners have allowed a portion of their earnings to be paid to their children. Petitioners have acquiesced in an arrangement designed, at least in part, to shift the incidence of tax liability to third parties unconnected in any meaningful way with their performance of services. [67 T.C. at 1005.]

The petitioners contend that this case is distinguishable from *Armantrout* because in that case, the Court found that the taxpayers had entered into "anticipatory arrangements" and that the plan was clearly a substitute for salary. They also contend that, unlike the record in *Armantrout,* the record in this case shows that the petitioners could not have bargained with Grant for the inclusion or exclusion of their children from the plan or for a larger salary or bonus in lieu of their children's participation in the plan. We are not convinced that there is any practical difference between the educational plan in *Armantrout* and the plan presented in this case.

As in *Armantrout,* it is clear that the opportunity to have their children participate in the Educo plan of Grant was a valuable incident or reward for services rendered to Grant. Only those employees considered most valuable were eligible under the plan, and a child's participation in the benefits under the plan depended upon the father's continued employment by Grant. The existence of the plan was used to recruit and retain

valuable employees, the benefits were substantial, and they served to motivate employees to become valuable to Grant. Thus, an eligible employee who began or continued to work for Grant with the knowledge that his children would receive benefits under the plan was in effect making an "anticipatory arrangement."

It is true that in *Armantrout,* the Court found that the plan was a substitute for additional compensation and pointed out that there had been no showing that the employer and the employees could not have bargained for compensation in some different form. Yet, as we read the *Armantrout* opinion, those considerations were not determinative of the Court's final conclusion. A reading of the Court's entire opinion makes it clear that it would have reached the same conclusion irrespective of the presence of those facts.

Similarly, the fact that the petitioners in this case could not bargain for eligibility in the Grant plan does not warrant a conclusion different from that in *Armantrout.* The opportunity to have the educational expenses of a child paid under the plan was a privilege which the petitioners received by reason of their employment by Grant, and as such, it represents additional compensation (*Commissioner v. LoBue,* 351 U.S. 243 (1956)); it merely represents the payment of compensation in a different "form" (*Commissioner v. Smith,* 324 U.S. 177 (1945)). The existence of the plan was a part of the total package of compensation offered by Grant to recruit and retain certain key employees; had Grant not offered such plan, it would have been required to provide additional compensation in some other form to remain competitive as an employer. Many employees have no opportunity to bargain for compensation plans designed to their particular wishes: Pension or other benefits may be provided for employees even though a particular employee may not desire the particular benefit; nevertheless, he is taxable on the benefits that he receives as a result of his employment. *United States v. Basye,* 410 U.S. 441 (1973).

Moreover, all four of the petitioners were officers of the company and constituted four of the six members of its board of directors during the years in issue. As members of the board, the petitioners not only effectively controlled their own salaries, but also designated the employees who were eligible under the plan and the amount payable to each participating child. Hence, the

petitioners were in a position to allow a portion of their compensation to be paid to their children. It is irrelevant that the petitioners could not have bargained with the company about their exclusion from the plan and the receipt of a larger salary. The fact remains that they controlled their membership in the plan and the benefits paid to their children.

The petitioners also argue that they did not receive any income as a result of the distributions under the plan to their children because the petitioners never had any right to receive such distributions themselves and because the payment of the educational expenses of their children did not provide an economic or financial benefit to them. They point to the facts that the petitioners never had a right to receive the educational benefits and that since under Illinois law, they were under no obligation to provide support for their children beyond the age of 18, the payment of the educational expenses of the children did not relieve the petitioners of any parental or other obligation. We reject such contentions since the payment of the educational expenses of the children provided a clear and substantial benefit for the petitioners resulting from their continued employment by Grant. Whether or not the petitioners had a legal obligation to furnish their children with a college education, it is clear that they felt a parental obligation to do so. Indeed, Mr. Krewer testified that one of the reasons why the company adopted the plan was to relieve its most valuable employees of the concern of providing a college education for their children. Also, two of the petitioners who testified, Messrs. Krewer and Flink, stated that they paid their children's college expenses before the adoption of the educational plan by Grant, and that they "possibly" or "probably" would have continued to do so if the company had not adopted the plan. Moreover, all the petitioners claimed as dependents their children who received disbursements under the plan. To conclude that the petitioners did not receive a taxable benefit by reason of the plan because there was no legal obligation for them to support their children would exalt form over substance and would ignore the realities of parental relationships in our times.

We also do not accept the petitioners' contention that the Commissioner's determinations in this case deny them due process of law since the determinations seek to tax job-related "benefits" or "enjoyments" when the Commissioner does not

seek to tax all taxpayers on similar job-related benefits. For the reasons already given, we are convinced that the benefits under the Educo plan constituted additional compensation received by the petitioners in this case. Whether the Congress and the Commissioner have properly concluded that some other types of job-related benefits should not be subjected to taxation involves questions not now before us. We lack sufficient evidence concerning the other benefits to which the petitioners refer to judge whether those other benefits are comparable and whether there are adequate reasons in fact or in policy for treating them differently under the tax laws. In any event, whether the legislative or administrative treatment of the other benefits is proper does not affect the tax treatment of the benefits received by the petitioners. See, e.g., *Davis v. Commissioner,* 65 T.C. 1014, 1022–1024 (1976). Our conclusion in this case is based solely on the record before us.

In *Armantrout,* there is no indication that the Commissioner took the position that the benefits under the Educo plan represented dividends received by the parents of children. Here, the Commissioner has adopted that position. Yet, we are satisfied that the plan was adopted for business reasons, namely, to improve the morale of the key employees, to retain them, and to recruit other key employees. Accordingly, we hold that the benefits under the Educo plan adopted by Grant do not represent dividends received by the petitioners but that such benefits do constitute additional compensation received by them. As we held in *Armantrout,* section 83 is applicable to such compensation, and since the petitioners did not have vested rights in the contributions made by Grant to the trust under the plan, they are taxable when the funds are distributed to or on behalf of their children.

Next, we must decide what provision of the Internal Revenue Code governs the deductibility of Grant's contributions under the Educo plan. The regulations under section 83 take the position that such section is applicable to the benefits received under an educational benefit plan similar to an Educo plan. Sec. 1.83–3(c)(4), example (2), Income Tax Regs. Section 83(h) relates to the deductibility of compensation subject to such section, but section 1.83–6(a)(3), Income Tax Regs., provides in part:

In the case of a transfer to an employee benefit plan described in sec. 1.162–10(a) or a transfer to an employees' trust or annuity plan described in section

404(a)(5) and the regulations thereunder, section 83(h) and this section do not apply.

Neither party has challenged the validity of such provision of the regulations; nor has either taken the position that the deductibility of Grant's contributions is governed by section 83(h). They both treat the issue as one of deciding whether section 404(a)(5) or section 162 is applicable, and for purposes of deciding this case, we accept that presentation of the issue and express no opinion about the possible application of section 83(h) to educational benefit plans.

Section 404(a) provides in part:

(a) GENERAL RULE.—If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year:

*     *     *     *     *     *     *

(5) OTHER PLANS.—If the plan is not one included in paragraph (1), (2), or (3), in the taxable year in which an amount attributable to the contribution is includible in the gross income of employees participating in the plan, but, in the case of a plan in which more than one employee participates only if separate accounts are maintained for each employee.

On the other hand, section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Section 1.162–10(a), Income Tax Regs., provides in part:

Amounts paid or accrued within the taxable year for dismissal wages, unemployment benefits, guaranteed annual wages, vacations, or a sickness, accident, hospitalization, medical expense, recreational, welfare, or similar benefit plan, are deductible under section 162(a) if they are ordinary and necessary expenses of the trade or business. * * *

To be deductible under either section 404(a)(5) or section 162(a), the contributions to the plan must constitute ordinary and necessary expenses of carrying on the business of Grant; we are satisfied that the contributions meet such test. See *W. M. Ritter Lumber Co. v. Commissioner*, 30 B.T.A. 231 (1934); *McCoy-Brandt Machinery Co. v. Commissioner*, 8 B.T.A. 909 (1927); *Elm City Cotton Mills v. Commissioner*, 5 B.T.A. 309 (1926).

Thus, the only issue is when are the contributions deductible: if Grant's plan is subject to section 1.162–10, Income Tax Regs., the contributions are deductible when made, but if such plan is subject to section 404(a)(5), the contributions are not deductible until the distributions under the plan are includable in the gross income of the employees.[5]

A similar issue was considered in *Latrobe Steel Co. v. Commissioner*, 62 T.C. 456 (1974). Latrobe had adopted a union-negotiated plan providing regular and extended vacations for its employees, and the Commissioner argued that the extended vacations under such plan constituted deferred compensation within the meaning of section 404 so that the contributions to the plan were subject to section 404(a)(5). However, we held that the plan was not such a plan of deferred compensation but was a plan subject to section 1.162–10, Income Tax Regs. The Commissioner now urges us to reconsider our decision in *Latrobe Steel* and to overrule it.

In *Latrobe Steel*, we carefully examined the legislative history surrounding the enactment of the predecessor of section 404(a). Based on such analysis, we concluded that the predecessor of section 404(a) was not intended to "apply to all plans that result in the deferral of compensation." (62 T.C. at 464.) The Court stated that "the phrase 'a plan deferring the receipt of compensation' contained in * * * [the predecessor of section 404(a)] should be interpreted to mean a similar plan deferring the receipt of compensation," and that "a plan deferring the receipt of compensation is subject to the rules of section 404(a) only if it is similar to the four types of plans enumerated." (62 T.C. at 464.) The Court then determined that the extended vacation plan in issue was not "similar to" a stock bonus, pension, profit-sharing, or annuity plan. The Court observed that such plan was "unlike either a pension or annuity plan since it is not designed to provide benefits to employees upon retirement," and that such plan was "unlike a profit-sharing or stock bonus plan since it is not designed to grant employees a share of the employer's profits and thereby create an incentive to contribute to the success of the employer." (62 T.C. at 465.)

In asking us to reverse *Latrobe Steel*, the Commissioner

---

[5] The Commissioner concedes that if Grant's plan is subject to sec. 404(a)(5), the requirements of such provision are satisfied and that Grant is entitled to deduct the contributions when the distributions are made under the plan.

overlooks the fact that section 404(a) and its predecessors have never been applied to all plans of deferred compensation. The plans described in section 1.162–10, Income Tax Regs., are also plans of deferred compensation. The services which earned an employee that right to receive dismissal wages may be performed in one year, but he may not receive the dismissal wages until many years later. Similarly, unemployment benefits and accident and health benefits may be paid years after the performance of the services to which they are attributable. Thus, as we said in *Latrobe Steel*, not all plans of deferred compensation are subject to section 404(a). In deciding whether a plan of deferred compensation is subject to section 404(a) or section 162, we held that such decision is to be based upon whether the plan is similar to a pension, annuity, profit-sharing, or stock bonus plan; if not, the plan is subject to section 1.162–10, Income Tax Regs. The Commissioner has failed to convince us that we should no longer follow our holding in *Latrobe Steel*.[6]

In *Citrus Orthopedic Medical Group v. Commissioner*, 72 T.C. 461 (1979), we considered another plan for the payment of educational benefits. In that case, the petitioner established an educational benefit plan, whereby the qualifying children of its key employees would receive cash benefits while attending a college or university. However, at all relevant times, two doctors, McElwee and Smith, were the corporation's sole shareholders, officers, and key employees. The children of the doctors did not have vested rights in the petitioner's contributions to the plan, and they received no disbursements from the plan during the years in issue. The petitioner claimed that it was entitled to deduct under section 162 its contributions to the trust which funded the plan. This Court rejected the petitioner's contention on two alternative grounds: (1) The Court found that the two doctors had retained absolute control over and responsibility for the investment and distribution of the trust funds; that the doctors could amend and terminate the plan at any time and

---

[6]Sec. 404(b) was amended by sec. 133(b) of the Revenue Act of 1978 (92 Stat. 2783) to substitute the words "other plan" for the words "similar plan." In discussing such change, the Conference report states that a method of compensation "having the effect of a plan deferring the receipt of compensation does not have to be similar to a stock bonus, pension, profit-sharing, or annuity plan to be subject to the deferred compensation deduction-timing rules." H. Rept. 95–1800 (1978), 1978–3 C.B. (Vol. 1) 521, 540. However, the amendment is applicable only to taxable years beginning after 1978. Since the amendment is not applicable to the years at issue in this case, it presents no reason for changing our holding in *Latrobe Steel*.

require that all contributed funds be returned; and that the trustees of the plan, who were the petitioner's attorneys, had no real power or authority over the plan. Therefore, the Court concluded that the contributions were not paid or incurred within the meaning of section 162(a) during the years in issue. (2) The Court stated that even if the contributions to the plan had economic meaning, the petitioner would not be entitled to a deduction in the years such contributions were made because the plan constituted a nonqualified deferred compensation plan under section 404(a)(5). Therefore, the Court held that under section 404(a)(5), such contributions would be deductible only in the year in which an amount attributable to the contributions was includable in the gross income of the employees participating in the plan. The Court observed that the plan was merely an attempt to defer the receipt and taxation of income until it was later needed to provide funds for the college education of the children of the two doctors. The Court also stated that "In effect, Citrus simply set aside a part of its 1974 and 1975 profits for the later education of the McElwee and Smith children in a manner 'similar' to the operation of a profit-sharing plan." (72 T.C. at 468.)

The Commissioner argues that even if we continue to follow *Latrobe Steel*, the Grant plan is subject to section 404(a)(5) because it is in substance a nonqualified profit-sharing plan. In deciding whether a plan is "similar" to a profit-sharing plan, *Latrobe Steel* held that the test was whether the plan was "designed to grant employees a share of the employer's profits." *Latrobe Steel Co. v. Commissioner*, 62 T.C. at 465; *Citrus Orthopedic Medical Group v. Commissioner*, 72 T.C. at 468. In *Latrobe Steel*, the plan was negotiated by a union and was for the benefit of employees generally. However, the beneficiaries of the Grant plan were the owners of the corporation. In the years before us, all the beneficiaries were owners.[7] In addition, the beneficiaries in 1973 owned 100 percent of the stock, and in 1974, more than 90 percent of the stock of Grant. Moreover, the owners were also the directors of the company, and as such, they could increase, decrease, or expand the benefits under the plan as they saw fit.

---

[7]For the later years for which we have information, the beneficiaries continued to be shareholders. However, Mr. Scott became an employee in 1977, and from the information in the record, it is not clear whether he also became a shareholder.

For a plan to qualify as a profit-sharing plan under section 401, the contributions to the plan must be made out of profits. Sec. 1.401–1(b)(1)(ii), Income Tax Regs. A similar test is applied in determining whether the contributions to a plan are subject to section 404(a)(1), relating to pension plans, or section 404(a)(3), relating to profit-sharing plans. It is true that the board of directors of Grant decided on a schedule of contributions to be made to the Educo plan for a number of years and that such contributions were to be made irrespective of the profits of Grant. It is also true that contributions were in fact made in 1975 and 1976 even though, according to its books and records, Grant had no profits for those years. Yet, Grant had sufficient retained earnings to cover its contributions to the plan, and the board of directors could have terminated the plan if it had wished to do so. Moreover, in applying the "similar to" test of *Latrobe Steel*, there is no requirement that the contributions to a nonqualified profit-sharing plan be limited in exactly the same manner as the contributions to a qualified profit-sharing plan. For the purpose of determining whether the contributions to a plan should be currently deductible under section 162(a) or whether the deduction should be deferred under section 404(a)(5), it is more significant to look to whether the plan benefits employees generally or whether the plan is for the benefit of the owners; when the benefits are restricted to the owners, there is reason for requiring that the deduction be deferred until the distributions are made from the plan. *Citrus Orthopedic Medical Group v. Commissioner*, 72 T.C. at 468.

Grant, of course, has the burden of proving that it is entitled to the deductions claimed by it. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933). To carry such burden, it must show that its Educo plan was not a form of profit-sharing plan subject to section 404(a)(5). It made no attempt to show that the plan was not a type or profit-sharing plan. In this respect, its only argument was that the plan was established for and served substantial business purposes. We have found that the plan was adopted to improve the morale of the key employees, to retain them, and to recruit other key employees. The existence of such conditions serves to establish that the Educo plan constituted a form of additional compensation and that it was not a program for the distribution of dividends. Yet, the existence of such conditions does not help in

deciding whether the Educo plan was a type of profit-sharing plan subject to section 404(a)(5) or whether it was a plan described in section 1.162–10 of the regulations. Any employer-sponsored plan to permit its employees to share in its profits may further the employer's business objectives in the same manner as the Educo plan has assisted Grant. In view of the facts suggesting that the Grant plan was a profit-sharing plan, and in view of Grant's failure to show otherwise, we conclude and hold that the Grant plan was similar to a profit-sharing plan and that, therefore, the deductibility of the contributions is governed by section 404(a)(5).

In *Educo, Inc. v. Alexander*, 557 F.2d 617, 622 (1977), the Seventh Circuit, in reference to plans administered by Educo, stated that such plans "are clearly characterizable as deferred-compensation plans." The issue before the Court of Appeals in that case was whether Educo had sufficient grounds for an injunction to prohibit the Commissioner of Internal Revenue from issuing a revenue ruling in which he determined that educational benefit plans similar to those administered by Educo constituted deferred compensation plans. The court held that Educo's suit for an injunction was barred by section 7421, the Anti-Injunction Act, as a "suit for the purpose of restraining the assessment or collection of any tax." (557 F.2d at 619.) The court stated that the determination of the IRS in the revenue ruling was a reasonable one, and therefore, it held that Educo could not obtain an injunction under the judicially created exception to such act which allows an injunction when "under no circumstances could the Government ultimately prevail" on the substantive merits of the controversy. (557 F.2d at 621.) Although the Court of Appeals did not have to decide whether the Educo plan was a plan of deferred compensation within the meaning of section 404(a), the court's statements are consistent with and support our conclusion in this case.

*Decision will be entered under Rule 155.*